2008 VT 98

## Richard Towns v. Northern Security Insurance Company

[964 A.2d 1150]

No. 07-089

Present: **Reiber, C.J., Dooley, Johnson, Skoglund and Burgess, JJ.**

Opinion Filed August 1, 2008

324

*John L. Franco, Jr.*, Burlington, for Plaintiff-Appellant/Cross-Appellee.

*Robert A. Mello* of *Law Office of Robert A. Mello, PLC*, South Burlington, for Defendant-Appellee/Cross-Appellant.

¶ 1. **Johnson, J.** This is the latest appeal in a long-running dispute over the remediation of environmental contamination of a property formerly owned by plaintiff/appellant Richard Towns in the Town of Johnson. The parties have cross-appealed from a series of trial court rulings relating to the availability of insurance coverage for the costs of investigation and abatement of the contamination under a policy issued by defendant/cross-appellant Northern Security Insurance Company (Northern) for a period of several years in the 1980s. The parties' claims include assertions that the trial court erroneously: (1) granted summary judgment in favor of Northern on the basis of the policy's business-pursuits exclusion; (2) rejected Northern's claim that continuous exposure to contamination during the policy period, which was discovered after the policy had expired, was insufficient to trigger coverage; (3) apportioned defense and indemnity costs between Towns and Northern based on the percentage of time spent on the risk; and (4) rejected Northern's claim that Towns's suit was barred by the doctrine of res judicata. Although not addressed by the trial court, claims based on the owned-property exclusion and prompt-notice provisions of the policy are also raised. For the reasons set forth

below, we affirm in part, reverse in part, and remand for further proceedings.

¶ 2. The underlying facts and procedural history may be summarized as follows. Towns resided at the property in Johnson from 1972 to 1987. During this time, he diverted a substantial amount of waste and debris from his waste-hauling business to the property for use as fill to level a steep embankment and create a safer and larger rear lot. He also used some of the debris to fill a small swimming hole in front of the property. Towns continued to deposit debris at the property until he sold it in June 1987. Thereafter, the new owners, concerned about the fill, contacted the Attorney General's Office which — after much delay — resulted in an administrative order in September 1996, alleging that Towns had effectively operated a solid-waste facility at the site without certification in violation of 10 V.S.A. § 6605(a). The order required Towns to hire an environmental consultant to develop a site-remediation plan, remove the solid waste, and restore the site with clean fill.

¶ 3. The Environmental Court affirmed the administrative order, and Towns appealed to this Court.[1] Without reaching the merits of the alleged violation, we reversed the judgment and remanded to the Environmental Court for essential findings and conclusions concerning Towns's statute-of-limitations defense. *Agency of Natural Res. v. Towns*, 168 Vt. 449, 454, 724 A.2d 1022, 1025 (1998) (*Towns I*). The Environmental Court rejected the statute-of-limitations claim on remand, and we subsequently affirmed the judgment in its entirety. *Agency of Natural Res. v. Towns*, 173 Vt. 552, 557, 790 A.2d 450, 456 (2001) (mem.) (*Towns II*).

¶ 4. While these matters were proceeding, Towns was also engaged in litigation with his homeowner's-insurance providers, seeking coverage for the defense and cleanup costs incurred in the underlying environmental-enforcement action. Towns's initial effort in this regard was a lawsuit, filed in June 1997, against Vermont Mutual Insurance Company, which had issued a homeowner's policy for a residence in Morrisville that Towns occupied after he sold the Johnson property in June 1987. The trial court entered summary judgment in favor of Vermont Mutual, rejecting Towns's

---

[1] While affirming the violation, the Environmental Court remanded to the Agency of Natural Resources (ANR) to clarify the remediation section, and subsequently certified ANR's decision as a final judgment for the purposes of appeal.

claim that the policy somehow covered the Johnson property, and we affirmed. *Towns v. Vt. Mut. Ins. Co.*, 169 Vt. 545, 545, 726 A.2d 65, 67 (1999) (mem.) (*Towns III*).

¶ 5. After a period of some delay (discussed more fully in Part IV, *infra*), Towns then filed this action against Northern for defense and indemnification costs based on a policy covering the Johnson property from November 1983 to June 1987. Northern, in response, moved to dismiss the complaint, alleging that the claims should have been raised in the earlier Vermont Mutual litigation and were therefore barred by the doctrine of res judicata. The trial court (Judge Martin presiding) denied the motion, finding a lack of identity between the parties and subject matter, and noting in particular that the case against Northern was based on a "wholly different [insurance] contract" from the one at issue in the earlier proceeding. The parties then filed cross-motions for summary judgment, focused principally on the duty to defend. Northern claimed that coverage was foreclosed as a matter of law on the basis of several policy exclusions, including the business-pursuits and owned-property exclusions. Citing the general principle that the duty to defend is broader than the duty to indemnify, the court (Judge Martin presiding) found that the facts alleged were sufficient to create the potential for coverage, and thereby activate the contractual duty to defend. See *City of Burlington v. Nat'l Union Fire Ins. Co.*, 163 Vt. 124, 127, 655 A.2d 719, 721 (1994) ("If any claims are potentially covered by the policy, the insurer has a duty to defend.").

¶ 6. Following a period of additional discovery and briefing, during which time groundwater contamination was discovered underlying the Johnson property, the court (Judge Katz presiding) issued a decision adopting the so-called "continuous trigger" theory, under which damage from continuous exposure to contaminants during the policy period is an "occurrence" sufficient to trigger coverage. Based on expert evidence showing continuous leakage of hazardous chemicals from the debris into the soil and groundwater underlying Towns's property during the policy period, the court concluded that the policy had been triggered. In a follow-up decision, the court also rejected Northern's claim that groundwater contamination must exceed state or federal enforcement standards to be considered property damage under the policy and denied Towns's motion to hold Northern responsible for all defense and indemnification costs, instead applying a pro rata

allocation based upon each party's "time on the risk." Based on this ruling, the court (Judge Toor presiding) subsequently calculated that Towns was responsible for 75% of the defense and indemnity costs (based on the time that he was self-insured in relation to the period that he owned the property) and Northern was responsible for 25%.[2]

¶ 7. A new round of summary judgment motions followed, resulting in a written decision in January 2007. Although Northern claimed that coverage was barred on several grounds, including the owned-property and prompt-notice provisions of the policy, the court (Judge Teachout presiding) ruled that the business-pursuits exclusion precluded coverage as a matter of law and did not address the other arguments. The court found that Towns's use of the debris for personal, nonbusiness purposes (the filling and leveling of his lot) was immaterial because the debris originated from the business and "[d]umping the trash" — regardless of location or purpose — "was an ordinary part of [the] business." Accordingly, the trial court ruled that Northern owed no duty to defend or indemnify Towns as a matter of law, and entered final judgment for Northern. Both parties have appealed, renewing each of the various claims raised below.

I.

¶ 8. We review a summary judgment applying the same standard as the trial court, and will uphold such a judgment if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law. *Fireman's Fund Ins. Co. v. CNA Ins. Co.*, 2004 VT 93, ¶ 8, 177 Vt. 215, 862 A.2d 251. Similarly, the interpretation of the terms of an insurance contract presents a question of law, not fact, and our review is therefore "plenary, and nondeferential." *Concord Gen. Mut. Ins. Co. v. Madore*, 2005 VT 70, ¶ 9, 178 Vt. 281, 882 A.2d 1152.

¶ 9. Towns first contends that the trial court erred in concluding that the so-called business-pursuits exclusion bars coverage. The policy contains a standard exclusion denying coverage for bodily injury or damage "arising out of business pursuits

---

[2] The court specifically determined that, during Towns's ownership of the property, he was self-insured from November 3, 1972 to November 2, 1983, or 4015 days, and was insured under the Northern policy from November 3, 1983 to June 28, 1987, or 1331 days.

of any insured or the rental or holding for rental of any part of any premises by any insured." This exclusion is subject, in turn, to a standard exception for "activities which are ordinarily incident to non-business pursuits." Identical or substantially similar policy provisions have been the subject of considerable litigation in this and other jurisdictions, although "[n]early all of the courts have found the language difficult of interpretation and application." *Robinson v. Utica Mut. Ins. Co.*, 585 S.W.2d 593, 595 (Tenn. 1979); see generally K. Abraham, *Environmental Liability and the Limits of Insurance*, 88 Colum. L. Rev. 942, 966 (1988) (discussing cases and observing that "[d]ecisions regarding the applicability of the owned-property exclusion to the costs of cleanup are by no means uniform"); D. Marchitelli, *Construction and Application of "Business Pursuits" Exclusion Provision in General Liability Policy*, 35 A.L.R.5th 375 (1996) (collecting cases). We have recognized, nevertheless, that the exception for "nonbusiness" pursuits operates to narrow the business-pursuits exclusion by essentially restoring coverage to some activities that admittedly "arise" out of the insured's business. See *Vt. Mut. Ins. Co. v. Gambell*, 166 Vt. 595, 596, 689 A.2d 453, 454 (1997) (mem.) (exception for nonbusiness pursuits should be read as providing that "coverage will be extended to liability which arises, even though connected in some causal manner with the insured's 'business pursuits,' out of an act or omission that is ordinarily not associated with or related to the insured's business pursuits" (quotation omitted)); see also *Vandenberg v. Cont'l Ins. Co.*, 2001 WI 85, ¶ 33, 628 N.W.2d 876 (noting that the nonbusiness pursuits exception "operates to restore coverage to some activities that admittedly 'arise out of' the insured's business pursuits" (quotation omitted)).

■ ■ ¶ 10. While obviously a context-specific inquiry, we have also identified certain factors relevant to distinguishing business from nonbusiness pursuits. In *Gambell*, for example, we observed that the acts or omissions alleged to have caused the injury in question did not "contribute to or further the interest of the insured's business" and were not "directly related to that business," and we therefore held that the nonbusiness pursuits exception applied to afford coverage under the policy. 166 Vt. at 596, 609 A.2d at 454. This is consistent with the approach taken by many courts across the country. See, e.g., *U.S. Fire Ins. Co. v. Reynolds*, 667 S.W.2d 664, 666 (Ark. Ct. App. 1984) (to fall within

the business-pursuits exclusion rather than the nonbusiness-pursuits exception, the act giving rise to liability "must be an act that contributes to, or furthers the interest of, the business"); *State Farm Fire & Cas. Co. v. Moore*, 430 N.E.2d 641, 645 (Ill. App. Ct. 1981) ("If an activity is not done for the purpose of expediting the insured's business . . . it is within the exception."); *Fire Ins. Exch. v. Alsop*, 709 P.2d 389, 391 (Utah 1985) (observing that if the activity giving rise to liability is "reasonably necessary in the carrying on of the business, then it should be regarded as part of the 'business pursuit' " exclusion) (quotation omitted); *Vandenberg*, 2001 WI 85, ¶ 36 ("One approach is to inquire whether the activity giving rise to the injury contributes to or furthers the interests of the business."). In determining whether the exception for nonbusiness pursuits applies, we have also cautioned against focusing on the conduct in question too "narrowly" because most tortious conduct "viewed in isolation from its context . . . can easily be categorized as ordinarily incident to nonbusiness pursuits." *Luneau v. Peerless Ins. Co.*, 170 Vt. 442, 447-48, 750 A.2d 1031, 1035 (2000); see also *N. Sec. Ins. Co. v. Perron*, 172 Vt. 204, 224, 777 A.2d 151, 165-66 (2001) (holding that, viewed in the context of their business, the defendant daycare providers' negligence in supervising their own children's contact with other children in their care was properly characterized as a failure to ensure the safety of the premises within the business-pursuits exclusion rather than an exception for the nonbusiness activity of caring for their own children shared by all parents).

¶ 11. Analyzed in the light of these cases and principles, the undisputed record evidence demonstrates definitively that the conduct at issue here falls within the nonbusiness-pursuits exception. As noted, Towns operated a trash-hauling business and, over the course of many years, selectively deposited a portion of the material that he had obtained through the business onto his property to fill and level a steep bank behind his house to make it safer and more accessible for his family. Towns testified without dispute that he did not save money by depositing the debris at his home rather than a landfill because two of the three landfills that he regularly used (the Johnson and Lamoille landfills) did not charge fees during the period in question, and the third (the Hardwick landfill) he owned. The residential property was never used as a disposal site by others.

■ ¶ 12. The record thus plainly discloses that, as the trial court found, the initial hauling of the debris was for profit and unquestionably "arose" out of a business pursuit. As noted, however, this does not end the inquiry, for the nonbusiness exception may nevertheless restore coverage for activities causally arising out of the business but not designed to further the interests of the business. See *Gambell*, 166 Vt. at 596, 689 A.2d at 454. Here, the evidence shows that Towns's diversion of some of the material to his property was solely for personal use — to fill, level and improve his lot. Towns's conduct, as he testified without objection, served no business purpose; he gained no financial advantage by using his own property rather than a landfill to dispose of the debris because he would not have incurred a deposit charge in any event. Indeed, he testified without objection that it was more expensive to divert the debris to his home than to follow his usual business practice. Furthermore, while most homeowners may not have the same means at their disposal, we discern nothing out of the ordinary — particularly during the period in question (the activity here began in the early 1970s) — for landowners in a small rural state to employ their own efforts to obtain and deposit fill for the improvement of their property. Indeed, the record shows that the subsequent purchasers of the Johnson property were initially informed by the Attorney General's Office "that such dumping was a common occurrence in Vermont." *Towns I*, 168 Vt. at 450, 724 A.2d at 1023. While Northern makes much of the fact that Towns's conduct resulted in the finding of a regulatory violation, the Environmental Court, in fact, found no violation under the regulations in existence prior to 1980, and observed of the subsequent "violation, however technical it may have been," that "as a practical matter, [the State] did not regulate it during the period in the same way they regulated municipal solid waste." In sum, therefore, we hold that, under the undisputed material facts, the conduct plainly falls within the nonbusiness exception to the business-pursuits exclusion, and coverage is not foreclosed on this basis.

¶ 13. In reaching a contrary conclusion, our dissenting colleague asserts that the "prolonged duration . . . and the overall amount of the material exceeds any activity that can be characterized as an ordinary personal use." *Post*, ¶ 44. Yet the dissent offers no guidance or explanation as to precisely how long or how much filling "activity" may be characterized as "normal" for personal

use or at what point such activity must be said to exceed "normal" use. The dissent also asserts that the "industrial nature" of the material precludes its personal use, *post*, ¶ 49, but again offers virtually no rationale for this conclusion. To support its argument, the dissent relies on one out-of-state decision, but the case is not on point. In *Velleman v. Continental Insurance Co.*, 616 N.Y.S.2d 146 (Sup. Ct. 1994), a trial court decision, the court ruled that the nonbusiness-pursuits exception did not apply when a UPS delivery person was injured while delivering a package to the insured's business which he conducted in a separate unit attached to his residence. The court rejected the insured's argument that UPS deliveries are "ordinarily incident to residential use," noting that the delivery was to the insured's business and that the insured had "placed a sign directing commercial deliverers along a particular path," and thus concluded that "[s]uch activities in the context of a commercial delivery can not be considered ordinarily incident to nonbusiness pursuits." *Id.* at 148-49. In language that the dissent appears to construe as supportive, the court further observed that "regular and frequent UPS deliveries/pickups are not usual activities ordinarily occurring at a residence." *Id.* at 149. The conclusion that regular and frequent *commercial* deliveries to a *business* conducted adjacent to the insured's residence is somehow equivalent to regular deposits of fill exclusively for personal use is far from obvious. Indeed, with respect, we find the case entirely inapposite.

¶ 14. The dissent relies on two additional out-of-state cases to support the assertion that Towns's personal use of the fill did "not transform an activity which was essentially business related into one ordinarily incident to nonbusiness pursuits." *Post*, ¶ 52 (quoting *State Farm Fire & Cas. Co. v. Stinnett*, 389 N.E.2d 668, 670 (Ill. App. Ct. 1979)). In *Stinnett*, the evidence showed that "all of the farmers in the locality mowed the weeds along the roads in order to keep them from spreading into the fields and reducing their yields." 389 N.E.2d at 669. Hence, the court found that "[s]uch mowing was therefore firmly established as a business activity," and easily rejected the makeweight argument that the incidental aesthetic benefit of making the farm "look[] nice" brought the mowing into the nonbusiness-pursuits exception. *Id.* at 669-70. Here, the evidence showed that the deposit of fill on Towns's property was *not* "essentially business-related," but done solely for personal benefit. As noted, Towns derived no commercial

benefit from the dumping, which would have been cheaper and easier in the landfills available at no cost.

¶ 15. Nor does *Grain Dealers Mutual Insurance Co. v. Farmers Alliance Mutual Insurance Co.*, 298 F.3d 1178 (10th Cir. 2002), although superficially similar to the case at bar, undermine this conclusion or compel a different result. In that case, the insureds ran a company on the same property as their dwelling in which, as part of a contract, they picked up over 12,000 cubic yards of fly ash and deposited it in a ravine on their property that they prepared as a commercial dump site by hiring a bulldozer to construct an earthen dam, cut down the sides of the fill site, and remove trees. The transportation and dumping yielded revenues of over $200,000. In addition to their homeowners' policy, the insureds had purchased a second commercial policy specifically to cover the fly-ash operation. In light of these circumstances, the court readily concluded that the transportation and dumping were done for a "profit motive," and hence constituted a business pursuit, and that the claimed "incidental benefit of reclaiming a ravine" for the owners did not alter its essential character. *Id.* at 1183-84 (quotation omitted). Here, as noted, Towns's hauling business and profit-motive were centered entirely on transporting debris to the landfills readily at his disposal, not to the deposit of fill at his residence. The dumping in this case was strictly for personal use, and yielded no profit. Although the debris originated "in some causal manner" from the business, as we have explained, that is not the test of whether the business-pursuits exclusion or the exception applies. *Gambell*, 166 Vt. at 596, 689 A.2d at 454 (quotation omitted). Where, as here, the insured's use of fill to level his property did not "further the interest of the insured's business," *id.*, and was an activity of the type normally engaged in by rural homeowners, the nonbusiness-pursuits exception plainly applies.[3]

---

[3] The dissent asserts that merely because Towns derived no profit from dumping the material on his property, or that the dumping in fact served no tangible business interest because he could more easily have utilized several landfills at no cost, does not transform the activity into a personal use. *Post,* ¶ 50. With respect, the existence of a profit motive is certainly relevant to whether an activity "contribute[s] to or further[s] the interest of the insured's business," *Gambell*, 166 Vt. at 596, 689 A.2d at 454, as is the fact that an activity provides no other business-related advantage. Equally misplaced is the dissent's reliance on the fact that Towns "obtained the material he deposited in his yard from sites he was

## II.

¶ 16. Northern also relies on the policy's owned-property exclusion. This standard exclusion provides that coverage does not apply to damage "to property owned by the insured" or to property "rented to, occupied or used by or in the care of the insured." Northern acknowledges that groundwater contamination caused by the debris has been discovered under Towns's property, but argues that the exclusion applies because no evidence has been adduced showing that the groundwater contamination has spread beyond the property, and no off-site remediation has been recommended by the experts or required by ANR.[4]

■ ■ ¶ 17. Numerous courts and commentators have considered whether the owned-property exclusion forecloses recovery of the costs of environmental-response measures employed on the insured's property. Although their conclusions are not entirely uniform, the vast majority have concluded that coverage is allowed for remediation expenses incurred in connection with the insured's property when necessary to prevent further injury to property owned by others. As one court has cogently summarized:

> In cases where environmental contaminants have migrated from a policyholder's property to an adjacent property, courts generally have agreed that the owned property exclusion does not relieve the insurer of all liability for response costs incurred by the cleanup of the policyholder's own property; coverage is not barred if the

---

contracted to clean up," as though this were dispositive of the issue. *Post*, ¶ 52. As the cases make clear, the fact that an activity is causally related or arose out of the insured's business is a *given* in the context of the nonbusiness pursuits exclusion. See *Gambell*, 166 Vt. at 596, 689 A.2d at 454. The question is whether the specific activity, viewed in context, was undertaken essentially to further the interests of the business or the personal interests of the insured, and, as discussed above, the answer here was plainly the latter.

[4] Although the trial court did not reach this issue, ruling that coverage was precluded on the basis of the business-pursuits exclusion, the issue was raised below and has been fully briefed on appeal. Furthermore, as explained in the discussion which follows, the issue does not turn on the resolution of any material disputed facts. Accordingly, in the interest of judicial economy, we deem it appropriate to address the issue. See *Cardiff v. Ellinwood*, 2007 VT 88, ¶ 12, 182 Vt. 602, 938 A.2d 1226 (mem.) (reaching issue not decided by trial court in the interest of judicial economy).

cleanup is designed to remediate, to prevent or to abate further migration of contaminants to the off-site property.

*Hakim v. Mass. Insurers' Insolvency Fund*, 675 N.E.2d 1161, 1164 (Mass. 1997); see also *State v. Signo Trading Int'l, Inc.*, 612 A.2d 932, 939 (N.J. 1992) (recognizing a "narrow exception" to the owned-property exclusion to allow recovery for the cost of measures on the insured's property to prevent immediate future damage to a nonpolicy holder's property "when a present injury has already been demonstrated"); see generally 7A J. Appleman, Insurance Law and Practice § 4526, at 241 (Cum. Supp. 2007) ("If the contamination has already damaged land belonging to persons other than the insured, the [owned property] exclusion does not bar coverage of any cleanup on the insured's land necessary to prevent further migration to another's property."). Although we have not previously addressed this issue, in *Gerrish Corp. v. Universal Underwriters Insurance Co.*, 947 F.2d 1023, 1030-31 (2d Cir. 1991), the Second Circuit Court of Appeals, applying Vermont law, affirmed a district court ruling that the costs of cleanup of contamination on the policyholder's property were covered where the evidence showed that a gasoline leak had "migrated to an adjacent property" and the cleanup was necessary to abate the seepage.

¶ 18. Consistent with this principle, courts have generally held that — in jurisdictions where groundwater is considered to be a public resource or trust of the state rather than privately owned — the owned-property exclusion does not bar coverage of the costs incurred to clean up and abate environmental pollution on the insured's property when it has contaminated the groundwater below. In such cases, the damage is considered to be to property not owned by the insured, and therefore within the exception allowing coverage for the costs of remediating the source of the contamination, even if located entirely within the insured's property. In *Olds-Olympic, Inc. v. Commercial Union Insurance Co.*, 918 P.2d 923 (Wash. 1996), for example, underground oil tanks on the insured's property ruptured, releasing fuel into the soil which then leaked into the groundwater beneath the property. The court held that because "there was injury to the groundwater, the property of the State," the owned-property exclusion did not apply to foreclose coverage of the costs of cleaning and monitoring the contaminated soil on the insured's

property. *Id.* at 930-31; accord *Intel Corp. v. Hartford Accident & Indem. Co.*, 952 F.2d 1551, 1565-66 (9th Cir. 1991) (holding that contamination of groundwater under insured's property was damage to property owned by others because under California law "[a]ll water within the State is the property of the people of the state" (quotation omitted)); *Ala. Plating Co. v. U.S. Fid. & Guar. Co.*, 690 So. 2d 331, 336-37 (Ala. 1996) (adopting principle that the "'owned property' exclusion does not exclude coverage for the costs of remediating groundwater contamination"); *Norfolk S. Corp. v. Cal. Union Ins. Co.*, 859 So. 2d 167, 193-95 (La. Ct. App. 2003) (owned-property exclusion did not exclude remediation efforts to clean up source of groundwater contamination on insured's property); *N. States Power Co. v. Fid. & Cas. Co. of N.Y.*, 504 N.W.2d 240, 246 (Minn. Ct. App. 1993) (holding that owned-property exclusion did not bar coverage of the expenses necessary to clean up soil contaminating groundwater under insured's property because groundwater is state property); *Reliance Ins. Co. v. Armstrong World Indus., Inc.*, 678 A.2d 1152, 1162 (N.J. Super. Ct. App. Div. 1996) (holding that coverage of costs incurred to clean up pollution causing groundwater contamination was not barred by owned-property exclusion); *State v. N.Y. Cent. Mut. Fire Ins. Co.*, 542 N.Y.S.2d 402, 403-04 (App. Div. 1989) (holding that oil spill on insured's property had caused damage to third party when it "entered the groundwater," which was held by the state as trustee for the people); *Robert E. Lee & Assocs. v. Peters*, 557 N.W.2d 457, 462 (Wis. Ct. App. 1996) (holding that coverage of cleanup costs for pollution on insured's site causing groundwater contamination is not barred by owned-property exclusion because "[g]roundwater contamination is damage to public property rather than property owned by an individual"); see generally E. Annis, *The Owned Property and Care Custody and Control Exclusions of the Comprehensive General Liability Policy*, 28 Gonz. L. Rev. 439, 444 (1993) ("In jurisdictions where the surface and ground waters are deemed owned by the State or the public, the [owned-property] exclusion does not prevent coverage."); R. Whitney, *Environmental Contamination and the Application of the Owned Property Exclusion to Insurance Coverage Claims: Can the Threat of Harm to the Property of Others Ever Get Real?*, 27 N. Ky. L. Rev. 505, 516 (2000) ("Where groundwater or surface waters are deemed to be owned by the public, or by the state itself, courts have found that the owned property exclusion does

not prevent coverage for remediation of environmental contamination of those waters.").

¶ 19. As noted, it is undisputed here that groundwater contamination from the debris deposited by Towns has been discovered beneath his former property. As in many states, however, groundwater in Vermont is not subject to private ownership. Under the Vermont Groundwater Protection Act, it is the express "policy of the state that the common-law doctrine of absolute ownership of groundwater is . . . abolished." 10 V.S.A. § 1410(a)(5). Consistent with the weight of authority, therefore, we conclude that the groundwater contamination identified in this case is not damage to property "owned" by Towns within the scope of the owned-property exclusion, and that the costs incurred to monitor and clean up the pollution causing the contamination are therefore not excluded from coverage.

¶ 20. We recognize, to be sure, that the Act also declares groundwater to be a mobile resource "necessarily shared among all users," *id.* § 1410(a)(3), in which "all persons have a right to the beneficial use and enjoyment . . . free from unreasonable interference by other persons," *id.* § 1410(a)(4). We are not persuaded, however, that this right creates an ownership interest sufficient to trigger the owned-property exclusion. See *U.S. Aviex Co. v. Travelers Ins. Co.*, 336 N.W.2d 838, 843-44 (Mich. Ct. App. 1983) (limited right to "reasonable use" of groundwater and to be free from interference with such right does not trigger the owned-property exclusion (quotation omitted)); *United States v. Conservation Chem. Co.*, 653 F. Supp. 152, 200 (W.D. Mo. 1986) (applying Missouri law to hold that the right to beneficial use of groundwater is not a property interest within the owned-property exclusion); *Morrone v. Harleysville Mut. Ins. Co.*, 662 A.2d 562, 565-66 (N.J. Super. Ct. App. Div. 1995) (rejecting the argument that a right to "beneficial use" of groundwater represents a proprietary interest sufficient to invoke the owned-property exclusion). Nor are we persuaded, as Northern asserts, that the related exclusion for property in the "care of" the insured applies to groundwater. Read in context, this exclusion for "damage to property rented to, occupied or used by or in the care of the insured" implies a degree of custody and control over the property inconsistent with the character of groundwater in Vermont as a public resource. At a minimum, the "care of" exclusion is

sufficiently ambiguous that it cannot be said to clearly include a public resource beneath one's property. See *City of Burlington v. Associated Elec. & Gas Ins. Servs., Ltd.*, 170 Vt. 358, 364, 751 A.2d 284, 289 (2000) (citing general rule that insurance-policy exclusions are to be strictly and narrowly construed in favor of the insured); *Morrone*, 662 A.2d at 566 (holding that, "other than being a source of potable water, [groundwater] is certainly not susceptible to the custody or control of a property owner" and "does not clearly fall within the category of 'owned property' for purposes of the exclusion"). Accordingly, we no find basis to exclude coverage as a matter of law under the owned-property exclusion.

 ¶ 21. In a related argument, Northern also asserts that groundwater contamination is not "property damage" under the policy unless it reaches levels that exceed state or federal clean-water laws and regulations governing safe drinking water. The policy here contains a standard definition of property damage as "physical injury to or destruction of tangible property." While the policy provides no additional guidance as to the meaning of "physical injury" or the level of harm necessary to constitute an "injury," at least one court has interpreted a similar provision to hold that groundwater is not "damaged" unless the contamination exceeds state or federal environmental-protection standards. *Muralo Co. v. Employers Ins. of Wausau*, 759 A.2d 348, 352 (N.J. Super. Ct. App. Div. 2000). We are not persuaded, however, that this approach is consistent with Vermont law, which requires that policy language be accorded its plain, ordinary meaning consistent with the reasonable expectations of the insured, and that terms that are ambiguous or unclear be construed broadly in favor of coverage. *Hardwick Recycling & Salvage, Inc. v. Acadia Ins. Co.*, 2004 VT 124, ¶ 23, 177 Vt. 421, 869 A.2d 82.

¶ 22. First, as a factual matter, there is no dispute here that chemicals from the waste and debris deposited by Towns have leached into the groundwater beneath his former property, resulting in contamination in excess of certain enforcement standards of the Vermont Water Quality Standards. The site-investigation report commissioned in response to the State's administrative order and the Environmental Court ruling sets forth in considerable detail the results of the independent environmental consultant's sampling and analysis of the groundwater. Under the section entitled "Groundwater Analytical Results," the report states that

groundwater samples from two of the three "piezometers" (shafts sunk to depths sufficient to retrieve groundwater samples) at the site "reveal levels of iron at [or] above Secondary Standards" and "levels of manganese at [or] above both Primary Enforcement Standard Levels and Primary Preventive Action Levels." The report goes on to observe: that the two test sites are within eighty and 130 feet respectively of an on-site drinking-water-supply well; that continued exposure to high levels of manganese may result in a variety of serious physical and emotional ailments; and that this health risk militates in favor of removing all of the on-site solid waste rather than simply closing or capping the landfill. Expert hydrologists retained by both Northern and Towns submitted opinions based on the data in the report.

¶ 23. While the policy language at issue here may provide no clear measure to determine when "damage" or "injury" to groundwater has occurred, we do not believe that — in light of such evidence — any reasonable person could dispute that the standard is met or exceeded here. Indeed, although Northern's expert hydrologist inaccurately described the report as finding manganese in the groundwater "at levels that exceeded Vermont's secondary enforcement standards" (as noted, the report found levels of the chemical in excess of primary enforcement stan-dards), even this is to acknowledge contamination in excess of enforcement standards. Nor, in our view, is there any doubt that costs incurred to monitor and remediate contamination, specifically in compliance with a government order finding a risk to public health and safety, fall within the normal understanding and reasonable expectations of an insured reading the damage section in question. See *Hardwick*, 2004 VT 124, ¶ 43 (construing similar property-damage provision to hold that government action to recover cleanup costs from discharge of hazardous materials on insured's property "fit within an insured's reasonable expectation as to what property damage so defined would be"). Accordingly, we find no basis to exclude coverage on this ground.

¶ 24. Our conclusion does not end the matter, however, for factual questions remain as to which remediation costs were incurred to prevent further damage to third-party property within the scope of coverage, and which were incurred solely to remedy damage to the insured's property within the owned-property exclusion, and whether as a practical matter the two can be separated in this case. See *Intel Corp.*, 952 F.2d at 1565-66

(remanding case for trier of fact to address this issue); *Hakim*, 675 N.E.2d at 1165-66 (same); see generally Annis, *supra*, at 447 (noting that even when expenses are incurred to prevent further contamination to third-party property, "it does not necessarily follow that all of the remediation expenses are covered" and "[a]ny portion of the remediation expenses which relate solely to improving the insured's property are excluded by the owned property exclusion."). Accordingly, the trial court is directed to address this factual issue on remand.

## III.

¶ 25. In related claims, Northern asserts on cross-appeal that the trial court erred in adopting the so-called continuous-trigger standard to determine whether there was an "occurrence" resulting in property damage under the policy. In turn, Towns contends that, in applying the continuous-trigger standard, the court erred in allocating defense and indemnity costs between Northern and Towns. Numerous courts and commentators have considered the question of what is necessary under a standard "occurrence" policy, like the one at issue here, to trigger coverage for property damage resulting from environmental contamination that is continuous or progressively deteriorating through successive policy periods. See generally *Montrose Chem. Corp. of Cal. v. Admiral Ins. Co.*, 913 P.2d 878, 893-95 (Cal. 1995) (outlining various "trigger" theories potentially applicable to occurrence-based policies); see also *Quincy Mut. Fire Ins. Co. v. Borough of Bellmawr*, 799 A.2d 499, 503-10 (N.J. 2002); J. Fischer, *Insurance Coverage for Mass Exposure Tort Claims: The Debate Over the Appropriate Trigger*, 45 Drake L. Rev. 625, 643-46 (1997); M. McMahon, *Event Triggering Liability Insurance Coverage as Occurring Within Period of Time Covered by Liability Insurance Policy Where Injury or Damage is Delayed—Modern Cases*, 14 A.L.R.5th 695 (1993) (collecting cases).

¶ 26. The trial court rejected Northern's proposal to apply what is known in the trade as a "manifestation" trigger, which requires that the environmental damage be discovered or manifested during the policy period, a standard that would result in a denial of coverage here because the contamination was discovered well after the Northern policy expired. See Fischer, *supra*, at 644 (under the manifestation theory, the policy is triggered "when the injury became reasonably apparent or known to the claimant"). As

noted, the court opted instead for a continuous-trigger theory, which recognizes coverage for environmental damage that occurs continuously from the date of exposure or initial injury through successive policy periods even if the damage is not manifested until after the policy has expired. See *Montrose*, 913 P.2d at 894 (under the continuous-trigger test, "bodily injuries and property damage that are continuous or progressively deteriorating throughout successive policy periods are covered by all policies in effect during those periods"); see generally Fischer, *supra*, at 646-50.[5]

¶ 27. As the trial court here recognized, the continuous-trigger test has gained widespread acceptance among courts across the country as the approach most compatible with the standard occurrence-based policy and the reasonable expectations of the insured in cases involving long-term environmental damage. See *Montrose*, 913 P.2d at 896-902 (reviewing cases and observing that "the weight of more recent authorities" supports application of the continuous-trigger test to determine coverage for damage result-ing from progressive or continuous exposure to the injury-inducing condition); *Soc'y Ins. v. Town of Franklin*, 2000 WI App 35, ¶ 8, 607 N.W.2d 342 (reviewing case law and concluding that "[t]he majority of courts that have considered the issue have adopted the continuous trigger theory"); R. Bratspies, *Splitting the Baby: Apportioning Environmental Liability Among Triggered Insur-ance Policies*, 1999 BYU L. Rev. 1215, 1230 ("A growing majority of courts facing insurance coverage questions for long-tail envi-ronmental injuries have adopted a 'continuous trigger' of liabil-ity."); see also *Developments in the Law — Toxic Waste Litiga-tion*, 99 Harv. L. Rev. 1458, 1581 (1987) ("The standard rule for property damage caused by hazardous waste has been that the occurrence is continuous, extending from disposal to manifestation of the damage.").

¶ 28. Like most of the standard occurrence-based policies at issue in these decisions, the Northern policy here provides among the stated "conditions" of coverage that it applies only to bodily injury or property damage "which occurs *during* the policy period." (Emphasis added.) The policy contains no other conditions

---

[5] In *State v. CNA Insurance Cos.*, 172 Vt. 318, 332, 779 A.2d 662, 673 (2001), we noted that the trial court there had also applied a continuous-trigger theory to environmental contamination but that the issue had not been preserved for review on appeal.

or language stating that such damage must also be *discovered* or *manifested* during the policy period. This had led many courts construing similar language to conclude that any damage occurring during the policy period triggers coverage, regardless of when it was discovered or reported. See, e.g., *Montrose*, 913 P.2d at 887, 892 (observing that nothing in the standard occurrence-based policy imposes as a "condition of coverage . . . that the damage or injury be discovered at any particular point in time" and holding that the standard occurrence-based policy "was intended to provide coverage when damage or injury resulting from an accident or 'injurious exposure to conditions' occurs during the policy period"); *Harford County v. Harford Mut. Ins. Co.*, 610 A.2d 286, 294 (Md. 1992) (observing that "[n]othing in the language of the policies . . . requires that the claimed property damage actually be discovered or manifested during the policy period" and holding that the trial court erred in applying a manifestation trigger to damage resulting from environmental contamination); *Trs. of Tufts Univ. v. Commercial Union Ins. Co.*, 616 N.E.2d 68, 74 (Mass. 1993) (rejecting manifestation trigger in environmental-contamination case where "[n]othing in the language of the policies requires that the claimed property damage be discovered or manifested during the policy period.").

¶ 29. As these and other courts have recognized, to conclude otherwise would in effect transform the typically more expensive occurrence-based policy into a cheaper claims-made policy, a form of coverage specifically designed to limit the insurer's risk by restricting coverage to claims made during the policy period *"without regard to the timing of the damage or injury." Montrose*, 913 P.2d at 903-04 ("[T]o apply a manifestation trigger of coverage to Admiral's occurrence-based . . . policies would be to effectively rewrite Admiral's contracts of insurance . . . , transforming the broader and more expensive occurrence-based . . . policy into a claims made policy."); see also *Kief Farmers Coop. Elevator Co. v. Farmland Mut. Ins. Co.*, 534 N.W.2d 28, 36 (N.D. 1995) (observing that claims-made coverage was "designed to limit . . . a carrier's risk" and that "interpreting an 'occurrence' policy to provide coverage only when the injury or damage becomes manifest during the policy period unfairly transforms the more expensive 'occurrence' policy into a cheaper 'claims made' policy"); accord *Sentinel Ins. Co. v. First Ins. Co.*, 875 P.2d 894, 918 (Haw. 1994); *Harford County*, 610 A.2d at 295.

¶ 30. Courts adopting the continuous-trigger test have also relied on language in the standard occurrence-based policy covering damage or injury from "continuous or repeated exposure" to the same injury-causing conditions. From this provision and the drafting history underlying it, courts have inferred a clear awareness by the drafters that coverage may result from circumstances like those presented here, where the damage is not linked to a single event but rather to long-term and continuous exposure to progressively deteriorating hazardous material. See *Montrose*, 913 P.2d at 892-93, 902-03 (reviewing the historical development of the standard occurrence-based policy and concluding that the drafters' inclusion of the "continuous exposure" language shows that they plainly understood "occurrence" to include damage from exposure to hazardous material within the policy period); *EnergyNorth Natural Gas, Inc. v. Underwriters at Lloyd's*, 848 A.2d 715, 720-21 (N.H. 2004) (concluding that the "drafting history" underlying adoption of the standard occurrence policy supports adoption of the continuous-trigger test). Although similar language appears in the "limits of liability" rather than the definitions section of the Northern policy, the implication of coverage for damage resulting from continuous exposure to a progressively deteriorating condition during the policy period is no less implicit.

¶ 31. Thus, in the common circumstance where hazardous chemicals progressively migrate into the surrounding soil and groundwater underlying an insured's property, numerous courts have applied the continuous-trigger test to hold each of the insurers on successive policies liable for the resulting environmental damage from the point of initial exposure or contamination through to the last triggered policy. See, e.g., *New Castle County v. Cont'l Cas. Co. (CNA)*, 725 F. Supp. 800, 812 (D. Del. 1989) (concluding in leachate pollution case that the "entire injurious process may constitute 'injury' under the terms of the policies"), *rev'd in part on other grounds sub nom., New Castle County v. Hartford Acc. & Indem. Co.*, 933 F.2d 1162 (3d Cir. 1991); *PSI Energy, Inc. v. Home Ins. Co.*, 801 N.E.2d 705, 734 (Ind. Ct. App. 2004) (holding successive insurers liable under a continuous-trigger theory for leakage from underground containers into groundwater where the "contamination continued to cause damage during the relevant policy periods to trigger coverage"); *Harford*, 610 A.2d at 294-95 (applying continuous-trigger theory to hold that policy covered costs of cleanup of progressive leakage of

pollutants into underlying groundwater discovered after expiration of policy period); *Bellmawr*, 799 A.2d at 511-14 (applying continuous-trigger theory to hold that damage from chemical leakage into groundwater triggered policy in effect when chemicals were initially deposited). In line with these and many other decisions too numerous to name, therefore, we hold that the trial court properly applied a continuous-trigger test to determine whether an injury-producing occurrence gave rise to coverage under the Northern policy.

¶ 32. The record here also supports the trial court's application of the continuous-trigger test to conclude that environmental damage occurred during the policy period. As Northern's own expert explained, the leaching of chemical constituents from material placed in the ground generally begins within one to six months with an initial "burst" of constituents lasting several months, followed by a relatively "steady state" of contamination lasting for as long as the material remains in place. Furthermore, Towns testified without dispute that the placement of waste and debris on his property was "ongoing" during the time that he occupied the home from 1972 to 1987, leaving no doubt that chemicals from the material leached into the surrounding soil and groundwater during the period from November 1982 to June 1987, when the Northern policy was in effect. Thus, the trial court correctly determined that a damage-producing "occurrence" was present during the policy period sufficient to trigger coverage.[6]

¶ 33. Although Towns agrees that the trial court applied the correct trigger, he challenges its subsequent decision to apportion only a percentage of the total costs of defense and indemnity to

---

[6] We recognize that courts and commentators have identified and applied different *initial* triggering events capable of setting off the continuous-trigger theory. Some have measured the damage-producing occurrence from the initial exposure of the soil or groundwater to the hazardous material. See, e.g., *Chem. Leaman Tank Lines, Inc. v. Aetna Cas. & Sur. Co.*, 89 F.3d 976, 995 (3d Cir. 1996) (applying New Jersey law to hold that "[u]nder the continuous trigger theory, exposure to the harm causing agent is sufficient to trigger potential coverage"). Others have held that the initial trigger should be the date of the first evidence of "injury-in-fact," as opposed to mere exposure. See, e.g., *Joe Harden Builders, Inc. v. Aetna Cas. & Sur. Co.*, 486 S.E.2d 89, 91 (S.C. 1997) (holding that "coverage is triggered at the time of an injury-in-fact and continuously thereafter to allow coverage under all policies in effect from the time of injury-in-fact during the progressive damage"). Under the facts presented here we need not resolve this particular issue, as the evidence leaves no doubt that both exposure and injury-in-fact occurred while the Northern policy was in effect.

Northern, based on the so-called "time-on-the-risk" allocation method. Courts applying the continuous-trigger test must often determine how to apportion coverage among multiple insurers who issued successive policies on the risk. Two principal methods have been identified for allocating coverage. One is joint-and-several liability, in which "any policy on the risk for any portion of the period in which the insured sustained property damage or bodily injury is jointly and severally obligated to respond in full, up to its policy limits, for the loss." T. Jones & J. Hurwitz, *An Introduction to Insurance Allocation Issues in Multiple-Trigger Cases*, 10 Vill. Envtl. L.J. 25, 37-38 (1999). The other method is "pro-ration by years" or "time on the risk," in which "each triggered policy bears a share of the total damages proportionate to the number of years it was on the risk, relative to the total number of years of triggered coverage." *Id.* at 42.

¶ 34. Many courts and commentators have concluded that the "time on the risk" method of allocating loss to each insurer proportionate to the damage suffered during its policy's term is most consistent with the continuous-trigger rule and the standard occurrence-based policy provision limiting coverage to damages occurring *during* the policy term on which it is based. See, e.g., *Spartan Petroleum Co. v. Federated Mut. Ins. Co.*, 162 F.3d 805, 812 (4th Cir. 1998) (concluding that "[p]ro rata liability is the 'logical corollary'" of the injury-in-fact-trigger rule "because that trigger hinges on the language that the . . . policy covers only damages . . . during the policy period" (quotation omitted)); *Pub. Serv. Co. v. Wallis & Cos.*, 986 P.2d 924, 940 (Colo. 1999) (where continuous-trigger rule applies, courts "should make a reasonable estimate of the portion of the 'occurrence' that is fairly attributable to each" policy-year using the pro rata method); *Outboard Marine Corp. v. Liberty Mut. Ins. Co.*, 670 N.E.2d 740, 748 (Ill. App. Ct. 1996) (rejecting joint-and-several allocation of environmental-cleanup costs in favor of pro rata allocation to insurers and policyholder on the basis of the risks assumed); *Arco Indus. Corp. v. Am. Motorists Ins. Co.*, 594 N.W.2d 61, 69 (Mich. Ct. App. 1998) (time-on-the-risk allocation method is the "logical corollary" of the occurrence policy providing coverage for damage sustained during policy period, but not for years outside the policy period); *EnergyNorth Natural Gas, Inc. v. Certain Underwriters at Lloyd's*, 934 A.2d 517, 526 (N.H. 2007) (finding "pro rata allocation to be superior to joint and several allocation because it is more

consistent" with the occurrence-based continuous-trigger rule and the expectations of the parties); *Consol. Edison Co. v. Allstate Ins. Co.*, 774 N.E.2d 687, 695 (N.Y. 2002) (holding in environmental contamination case that "[p]ro rata allocation . . . is consistent with the language of the policies" which "provide indemnification for liability incurred as a result of an accident or occurrence during the policy period, not outside that period"); see generally Jones & Hurwitz, *supra*, at 42 (noting that "courts adopting pro-ration by years recognize that the definitions of 'occurrence,' 'bodily injury' and 'property damage' " militate in favor of an allocation of loss proportionate to the policy term).

¶ 35. Courts and commentators have also recognized that the time-on-the-risk method offers several policy advantages, including spreading the risk to the maximum number of carriers, easily identifying each insurer's liability through a relatively simple calculation, and reducing the necessity for subsequent indemnification actions between and among the insurers. See *Olin Corp. v. Ins. Co. of N. Am.*, 221 F.3d 307, 323 (2d Cir. 2000) (observing that allocation among multiple triggered policies "avoids saddling one insurer with the full loss, [and] the burden of bringing a subsequent contribution action"); Jones & Hurwitz, *supra*, at 42-43 (courts have "reason[ed] that a simple calculation based on time on the risk is the most equitable and efficient means of allocating indemnification obligations"); see also M. Doherty, Comment, *Allocating Progressive Injury Liability Among Successive Insurance Policies*, 64 U. Chi. L. Rev. 257, 281 (1997) (advocating application of the time-on-the-risk method "because its inherent simplicity promotes predictability, reduces incentives to litigate, and ultimately reduces premium rates").

¶ 36. Consistent with the principle that an insurer's liability for damages resulting from long-term exposure to injury-producing conditions such as environmental pollutants should be proportionate to its time on the risk, many courts have also held that it is appropriate to allocate both the costs of indemnification *and* the costs of defending claims arising from such long-term conditions. See, e.g., *Gulf Chem. & Metallurgical Corp. v. Assoc. Metals & Minerals Corp.*, 1 F.3d 365, 371-72 (5th Cir. 1993) (reasoning that "[t]he insurer has not contracted to pay defense costs for occurrences which took place outside the policy period" and therefore applying Texas law to reject joint-and-several liability and instead apportion defense costs among multiple insurers on a pro rata

basis); *Commercial Union Ins. Co. v. Sepco Corp.*, 918 F.2d 920, 924 (11th Cir. 1990) (declining to hold insurer responsible "to provide defense for exposure unquestionably outside of its coverage" and therefore upholding trial court's pro rata apportionment of defense costs); *Ins. Co. of N. Am. v. Forty-Eight Insulations, Inc.*, 633 F.2d 1212, 1225 (6th Cir. 1980) (holding that as "indemnity costs can be allocated by the number of years [of exposure]" and "[t]here is no reason why this same theory should not apply to defense costs"); see generally Jones & Hurwitz, *supra*, at 49 (observing that "the allocation of defense costs is commonly based on the same theory as the allocation of indemnity obligations" so that "defense costs are allocated to all triggered policies in proportion to each policy's time on the risk").

¶ 37. Furthermore, where the policyholder is self-insured for any period of time on the risk, many courts have concluded that it is equally fair and reasonable to hold the policyholder responsible for that portion of the total defense and indemnity costs over which he or she chose to assume the risk. See, e.g., *Olin Corp.*, 221 F.3d at 323 ("Allocation also forces an insured to absorb the losses for periods when it self-insured and can prevent it from benefitting from coverage for injuries that took place when it was paying no premiums."); *Spartan Petroleum*, 162 F.3d at 812 (holding that for any period of progressive damage when no insurer was on the risk, the insured should reasonably bear the loss, "otherwise [it] would be to make an insurer liable for damages that occurred when it was *not* on the risk"); *Stonewall Ins. Co. v. Asbestos Claims Mgmt. Corp.*, 73 F.3d 1178, 1203 (2d Cir. 1995) ("[P]roration-to-the-insured is a sensible way to adjust the competing contentions of the parties in the context of continuous triggering of multiple policies over an extended span of years."); *Gulf Chem.*, 1 F.3d at 372 (holding that the "insured must bear its share of those [defense] costs determined by the fraction of the time of injurious exposure in which it lacked coverage"); *Domtar, Inc. v. Niagara Fire Ins. Co.*, 552 N.W.2d 738, 744-45 (Minn. Ct. App. 1996) (affirming pro rata allocation to policyholder for periods when it was not insured), *rev'd in part on other grounds*, 563 N.W.2d 724 (Minn. 1997).

¶ 38. Consistent with the reasoning of these authorities, therefore, we conclude that the trial court here properly allocated defense and indemnity costs between Towns and Northern based on the percentage of each party's time on the risk.

## IV.

¶ 39. Northern's two remaining claims require no extended discussion. First, Northern renews its claim that the court erred in denying its motion to dismiss on the basis of res judicata. It asserts that the claims should have been raised in Towns's earlier suit against Vermont Mutual. To recall, in that action, Towns had unsuccessfully attempted to obtain coverage under a Vermont Mutual policy covering the home in Morrisville that he owned and occupied after selling the Johnson property in 1987. We affirmed a summary judgment in favor of Vermont Mutual, rejecting Towns's claim that the Vermont Mutual policy somehow covered "formerly owned" property of the insured. *Towns III*, 169 Vt. at 545, 726 A.2d at 66.

¶ 40. Northern asserts that the parties, subject matter, and causes of action in the Vermont Mutual litigation were identical to those here, and that any claims against it should have been raised and tried in the earlier proceeding and are therefore barred. See *Cold Springs Farm Dev., Inc. v. Ball*, 163 Vt. 466, 472, 661 A.2d 89, 93 (1995) ("Claim preclusion bars litigation of claims or causes of action which were or might properly have been litigated in a previous action."); *Berlin Convalescent Ctr., Inc. v. Stoneman*, 159 Vt. 53, 56, 615 A.2d 141, 143 (1992) (Res judicata "bars the litigation of a claim or defense if there exists a final judgment in former litigation in which the parties, subject matter and causes of action are identical or substantially identical." (quotation omitted)).

¶ 41. This contention is unpersuasive. Even assuming, as Northern claims, that it was in privity with Vermont Mutual as a wholly owned subsidiary, the subject matter of the two suits involves the interpretation and application of two entirely different insurance policies, and the judgment as to one cannot, by any stretch of reasoning, be binding as to the other. See *State Life Ins. Co. v. Goodrum*, 74 S.W.2d 230, 231 (Ark. 1934) (where insurer issued two life insurance policies for decedent and obtained judgment in proceeding involving the first policy, court would not apply res judicata to bar action on the second policy because "[t]he basis and foundation of these suits were the respective contracts of insurance upon the life of the insured"); *Peoples-Home Life Ins. Co. v. Haake*, 604 S.W.2d 1, 8 (Mo. Ct. App. 1980) (rejecting claim that judgment in favor of life insur-

ance company was res judicata as to subsequent case involving another policy issued in favor of the same decedent where the second policy was issued by a different company and the action turned "upon a distinct separate policy of insurance"). Accordingly, res judicata does not apply.

¶ 42. Finally, Northern contends that Towns forfeited any coverage by failing to comply with the policy's prompt-notice requirement. See *Coop. Fire Ins. Ass'n v. White Caps, Inc.*, 166 Vt. 355, 356, 694 A.2d 34, 34 (1997) (citing rule that insurer may be relieved from contractual obligations if insured violates prompt-notice requirement). The policy here provides that, in the event of an accident or occurrence, the insured must provide written notice to the insurer or its agent "as soon as practicable which sets forth: (1) the identity of the policy and insured." The record discloses that, shortly after receiving the State's administrative order in October 1996, Towns (through his attorney) sent a letter to his insurance agent notifying him of the State's enforcement action, requesting that he notify in turn "all applicable carriers from his current carrier back to 1978," and demanding "that such carriers" provide a defense against the claim. The letter did not specifically identify any particular homeowner's policy or carrier. Shortly thereafter, Towns's attorney received a response from Vermont Mutual, the insurer of his Morrisville property, acknowledging receipt of the notice and the policy then in effect for the Morrisville residence, but stating that it had not been able to locate any policy covering the Johnson property apart from an application for coverage provided by the agent. Nearly five years later, in October 2001, the parties stipulated to the existence of a Northern policy in effect for the Johnson property from November 1983 to June 1987.

¶ 43. The trial court did not reach the late-notice issue, and we decline to do so here. Apart from the unresolved questions as to whether Towns's letter substantially complied with the contractual-notice requirement notwithstanding its failure to set forth "the identity of the policy," and whether such notice was a precondition of coverage, a resolution of the issue may also turn on the fact-specific question of whether Northern was prejudiced as a result of the omission. See *Coop. Fire*, 166 Vt. at 356, 694 A.2d at 35 (holding that insurer must prove that it was prejudiced by delayed notice before it may be relieved from contractual duties); *Putney Sch., Inc. v. Schaaf*, 157 Vt. 396, 404-05, 599 A.2d

322, 327 (1991) (noting the general rule in Vermont that "substantial compliance with notice requirements will suffice"). Accordingly, the trial court is directed to address this remaining issue on remand.

*The judgment is affirmed in part, reversed in part, and the case remanded for further proceedings consistent with the views expressed herein.*

¶ 44. **Reiber, C.J.,** dissenting. I dissent from the majority's conclusion that Towns's action of disposing on his property large amounts of construction and demolition debris procured through his business is an activity ordinarily incident to homeownership and therefore excepted from the business-pursuits exclusion in his homeowner's insurance policy. The prolonged duration of Towns's disposal, the type of materials deposited, and the overall amount of the material exceeds any activity that can be characterized as an ordinary personal use. I would affirm the trial court's decision that the business-pursuits exclusion, but not the exception, applies, and therefore that there is no coverage.

¶ 45. As described by the majority, Towns's homeowner's insurance policy contained an exclusion for property damage "arising out of business pursuits." This exclusion was limited by an exception for "activities which are ordinarily incident to non-business pursuits." The business-pursuits exclusion allows insurance providers to separate the risks associated with business and personal activities and therefore to keep premium levels for homeowner's policies at a reasonable level. 9A L. Russ & T. Segalla, Couch on Insurance § 128:12, at 128-30 to 128-31 (3d ed. 2006); see *Smith v. State Farm Fire & Cas. Co.*, 656 N.W.2d 432, 437 (Minn. Ct. App. 2003) (explaining that the business-pursuits exclusion deletes coverage that is not essential to homeowners to keep premiums at a reasonable level).

¶ 46. "[T]he non-business pursuits exception operates to restore coverage for some activities that in fact arise out of the insured's business pursuits." 9A Russ & Segalla, *supra*, § 128:23, at 128-50. In construing such provisions, we have explained that the exception to the exclusion applies when the insured's activities "are usual to his or her nonbusiness pursuits." *Vt. Mut. Ins. Co. v. Gambell*, 166 Vt. 595, 596, 689 A.2d 453, 454 (1997) (mem.). "For an activity to be a business pursuit, it must be an act that is solely referable to the conduct of the business and one that the

insured would not normally pursue but for the business." *Id.* Thus, purchasers can expect coverage when an activity, although connected to the insured's business, is ordinarily incident to a nonbusiness pursuit. See *Concord Gen. Mut. Ins. Co. v. Woods*, 2003 VT 33, ¶¶ 13-14, 175 Vt. 212, 824 A.2d 572 (explaining that the expectations of the parties are important to interpreting exclusions in an insurance contract).

¶ 47. In applying the exclusion, the majority concludes that the initial hauling of the debris was for profit and part of Towns's business, and was thus subject to the business-pursuits exclusion. I agree. The majority, however, further concludes that Towns's activities fall within the nonbusiness-pursuits exception to the exclusion for two main reasons: because it was ordinary at the time for landowners in a small rural state such as Vermont to deposit fill on their property; and because Towns did not save any money by depositing fill on his property as opposed to at a proper waste disposal site. I find neither reason convincing.

¶ 48. Although it may be true that at times landowners deposit fill on their property, the type of the material Towns deposited and the amount of fill he used preclude any finding that his endeavor was an ordinary personal activity.[7] Towns deposited debris on his property for a significant period of time — from 1972 to 1987. The total amount of material was at least 4000 cubic yards. The items Towns deposited were construction and demolition debris he obtained through his waste-hauling business. Far

---

[7] In support of its assertion that Towns's actions were ordinary, the majority relies on information recited in our earlier opinion that the Attorney General's Office initially told the purchasers of Towns's property that dumping was a common occurrence in Vermont. *Agency of Natural Res. v. Towns*, 168 Vt. 449, 450, 724 A.2d 1022, 1023 (1998). I fail to see how this comment supports the majority's conclusion that Towns's prolonged disposal of construction materials on his property was an ordinary action. The characterization of dumping as a "common occurrence" was made by an employee at the Attorney General's Office based on a description provided by the purchaser, who did not know the extent of the fill or the nature of the fill, and before anyone from the Attorney General's Office actually inspected Towns's property. As we explained in our previous opinion, the Attorney General's Office also told the purchaser, based on the information she provided, that "the State would not take action because the fill was covered, was not visible from the road, and was not leaching into water." *Id.* Once an inspection actually did occur, and the state had information about the type and amount of material Towns deposited on his site, the state *did* take action. Thus, there is no evidence that, once the state understood the extent and nature of Towns's disposal, the state characterized this disposal as "ordinary."

from ordinary "fill," these items included, among other things, scrap lumber, metal duct work, fiberglass insulation, concrete, metal roofing, shingles, a washing machine, dryer, and refrigerator. In fact, the Towns site was deemed by the state to be a solid waste facility subject to regulation, and requiring a permit, during its last seven years of operation. *Ante,* ¶ 2. Even ignoring the fact that the material was obtained through the course of Towns's business, the prolonged duration and overall amount of the fill exceeds any activity that can be characterized as an ordinary personal use.[8] See *Velleman v. Cont'l Ins. Co.,* 616 N.Y.S.2d 146, 148-49 (Sup. Ct. 1994) (explaining that although courier deliveries are common to households, the regularity and frequency of deliveries associated with insured's business precluded them from being characterized as ordinarily incident to nonbusiness use).[9]

¶ 49. In this case, given the large quantity of fill and the industrial nature of the fill, Towns's disposal of these materials on his property was very different from an operation that an ordinary homeowner might undertake. "[I]t is unlikely the parties expected to cover the increased risks associated" with this type of large-scale, industrial activity. *Id.* at 149; *Luneau v. Peerless Ins. Co.,* 170 Vt. 442, 448-49, 750 A.2d 1031, 1035-36 (2000) (explaining that parties to a homeowner's policy would not reasonably expect coverage for the different legal duties and the greater risk associated with business activities).

¶ 50. I also find no basis for the majority's conclusion that Towns's conduct "served no business purpose" because he saved no money by depositing the debris at his home. *Ante,* ¶ 12.

---

[8] The majority criticizes this dissent for failing to provide guidance on "precisely how long or how much filling 'activity' may be characterized as 'normal' for personal use." *Ante,* ¶ 13. As the majority recognizes, however, distinguishing business from nonbusiness pursuits is a "context-specific" inquiry. *Ante,* ¶ 10. Thus, the sole question before us is whether Towns's activity, when viewed in its entirety, was part of his business, not what activity hypothetically might amount to a nonbusiness pursuit in another situation.

[9] The majority deems *Velleman* inapposite because the regular and frequent deliveries were business-related material made to a business entrance of the insured's residence. I fail to understand how this is different from Towns's regular and frequent delivery of business materials to his home. In any event, the main point is that just as courier deliveries are not so frequent at residences "so as to be an expected adjunct to a homeowner's activities," *Velleman,* 616 N.Y.S.2d at 149, regular deposit of commercial waste, obtained for profit through his waste hauling business, is not an activity that is expected as ordinarily occurring at a residence.

Whether Towns saved any money by depositing the items in his backyard as opposed to in a landfill does not answer the question of whether the hauling and disposing of the items served a business purpose. Towns's clients paid him to collect, haul and dispose of industrial waste. Rather than dispose of the items in a landfill, Towns chose to deposit some of the debris on his property. The majority claims that because Towns's business did not receive any additional benefit from his diversion of the debris to his residential property, the activity was transformed into an ordinary personal use. Thus, the majority attempts to separate the disposal part of the business from Towns's waste hauling enterprise and looks for a distinct profit earned on the choice of dumpsite. The dumping of the waste, however, cannot be discretely isolated from the fees Towns received for the removal and transportation of the debris for disposal elsewhere, and the majority's ruling otherwise is contrary to our prior decisions on the exception to the business-pursuits exclusion. In evaluating whether an activity can be considered ordinarily incidental to a nonbusiness pursuit, we have. not focused on the action in isolation, but in the context of the situation. See *N. Sec. Ins. Co. v. Perron*, 172 Vt. 204, 223-24, 777 A.2d 151, 165 (2001) (holding that while parents have general responsibility to supervise their children, in context of a home daycare, failure to supervise is a business activity). In *Luneau v. Peerless Insurance Co.*, we rejected an approach that looked "narrowly at the activity in which the insured was engaged when the tort occurred." 170 Vt. at 447, 750 A.2d at 1035. We explained that "narrow distinctions tend to eat up the business pursuits exception because tortious conduct, viewed in isolation from its context, rarely advances a business interest and can easily be categorized as ordinarily incident to nonbusiness pursuits." *Id.* at 447-48, 750 A.2d at 1035.

¶ 51. In *Luneau*, a wedding disc jockey got in a physical fight with a guest. During the fight, a speaker was knocked over and injured the plaintiff. The plaintiff argued that fighting was a nonbusiness activity and therefore there was coverage under the disc jockey's homeowner's policy for the injury. This Court disagreed, explaining that it was the disc jockey's negligence in placing the speaker that was at issue and that this was related to his business duty "to maintain a safe space for his customers." *Id.* at 449-50, 750 A.2d at 1035-36. In so doing, we did not examine whether the specific conduct particularly profited the business.

Indeed, the jockey's business did not benefit in any way from his act of negligently arranging the speaker or from engaging in a fight, but we nonetheless held that the jockey's activities were part of his business that was profit-motivated in general. *Id.* at 449, 750 A.2d at 1036.

¶ 52. Towns does not dispute that he obtained the material he deposited in his yard from sites he was contracted to clean up, that he was paid to remove the debris from those sites, and that without these contracts, he would not have had access to these materials. As the majority recognizes, most homeowners would not have the same means at their disposal. *Ante,* ¶ 12. Towns obtained the materials through his business and was paid by contract to dispose of the items. Therefore, the activity was "one that the insured would not normally pursue but for the business." *Gambell,* 166 Vt. at 596, 689 A.2d at 454. That Towns also received a perceived additional personal benefit of filling in a large ravine on his property by depositing the material in his yard instead of at a proper waste-disposal site does "not transform an activity which was essentially business related into one ordinarily incident to non-business pursuits." *State Farm Fire & Cas. Co. v. Stinnett,* 389 N.E.2d 668, 670 (Ill. App. Ct. 1979) (holding that insured's act of mowing the weeds along the roads around his farm was a business activity intended to keep weeds from spreading into his fields and that the additional benefit of keeping farm "looking nice" did not transform the activity into a nonbusiness pursuit); see also *Grain Dealers Mut. Ins. Co. v. Farmers Alliance Mut. Ins. Co.,* 298 F.3d 1178, 1183-84 (10th Cir. 2002) (applying Oklahoma law) (holding that landowners' act of depositing fly ash on their property was a business venture because it was done as part of an ash-hauling contract and that the incidental benefit of reclaiming a ravine did not transform it into a property improvement project).

¶ 53. Because disposing of construction and demolition debris was an integral part of Towns's business and because this disposal far exceeded any expected, ordinary nonbusiness activity, I would affirm the trial court's conclusion that the business-pursuits exclusion bars coverage in this case. I am authorized to state that Justice Burgess joins this dissent.