GRAIN DEALERS MUTUAL INSURANCE COMPANY, Plaintiff–Appellant,

v.

FARMERS ALLIANCE MUTUAL INSURANCE COMPANY, Defendant–Appellee.

No. 01–6225.

United States Court of Appeals, Tenth Circuit.

June 13, 2002.

Mort G. Welch (Sherry L. Smith with him on the brief) of Welch & Smith, Oklahoma City, OK, for Plaintiff–Appellant.

Donald R. Wilson (Michael S. McMillin with him on the brief) of Fenton, Fenton, Smith, Reneau & Moon, Oklahoma City, OK, for Defendant–Appellee.

Before SEYMOUR, ALDISERT,* and EBEL, Circuit Judges.

ALDISERT, Circuit Judge.

This appeal requires us to interpret a farmowners-ranchowners insurance policy clause that excludes coverage for "bodily injury or property damage arising out of business pursuits," when the sequela of conducting a legitimate business activity on the property was the enhancement of the farm property covered by the policy. To do this, we must apply Oklahoma law in a dispute between two companies that have issued insurance policies.

Robert and Mary McQuary, husband and wife, purchased a farmowners-ranchowners policy from Farmers Alliance Mutual Insurance Company, which covered a tract of thirty-three acres on which their dwelling is located. The policy named Robert and Mary McQuary as the insureds.

---

* Ruggero J. Aldisert, Senior United States Circuit Judge for the Third Circuit, sitting by designation.

Mr. and Mrs. McQuary are the sole shareholders and officers of R&M Fleet Services ("R&M"), a company located on the same property as their dwelling. When R&M entered into a contract to purchase and transport fly ash, the McQuarys then directed their insurance agent to purchase a second insurance policy—a commercial policy which covered their business operations. The agent placed it with Grain Dealers Mutual Insurance Company, who issued a commercial lines policy to Robert and Mary McQuary d/b/a/ R&M Services. The same agent placed both insurance policies for the McQuarys.

R&M then contracted with Dowell Schlumberger, Inc. (hereinafter "Dowell") for the removal and transportation of fly ash. Under the contract, R&M would remove fly ash from Dowell's facility and then transport and dump the ash in a ravine on the McQuarys' property. The ravine was essentially unusable, consisting of steep terrain and large rocks. The McQuarys intended to fill the ravine with fly ash and then cover it with top soil. The operation commenced in 1995 and continued until 1998 without incident.

Herman and Mary Pieratt live on acreage adjacent to the McQuarys' property. In March 1998, Herman Pieratt complained that fly ash and top soil from the McQuarys' property had washed onto and damaged his property as a result of heavy rains earlier that year. Thereafter, he filed suit against McQuary and Dowell in the District Court of Creek County, Oklahoma (hereinafter, "the predicate lawsuit"). The complaint alleged that Dowell was operating a dump on the McQuarys' property by depositing fly ash, which was "a nuisance" and had "caused Plaintiff and his property harm and damage." It is the defense of this lawsuit that caused the flash point of controversy between the two insurance companies.

In the predicate lawsuit, Grain Dealers assumed responsibility under its commercial lines policy and then requested Farmers to participate as well. Farmers refused, relying on clauses in the policy excluding coverage for damages caused by "business pursuits" or pollutants. Grain Dealers then filed the present litigation in the district court, requesting a declaratory judgment requiring Farmers to assist in the defense of the predicate lawsuit. The district court granted summary judgment in favor of Farmers, holding that under the policy, Farmers had no duty to defend because of the two exclusionary clauses. Grain Dealers now appeals. We affirm.

The district court originally had jurisdiction in this diversity action, which is governed by Oklahoma law. 28 U.S.C. § 1332. An appeal was timely filed under Rule 4(a)(1) of the Federal Rules of Appellate Procedure. We have jurisdiction pursuant to 28 U.S.C. § 1291.

■ "The Court reviews a district court's decision to grant summary judgment *de novo,* applying the standard set forth in Fed.R.Civ.P. 56(c)." *Wright v. Abbott Lab., Inc.,* 259 F.3d 1226, 1231 (10th Cir.2001); *Byers v. City of Albuquerque,* 150 F.3d 1271, 1274 (10th Cir.1998). Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Rule 56(c), Federal Rules of Civil Procedure.

**I.**

In the predicate lawsuit, Pieratt alleged that fly ash had "left the property owned by ... McQuary and has entered, migrated, washed, and run onto property owned by Plaintiff, causing harm and damage to

Plaintiff's property, including a five-acre lake." *Pieratt v. Dowell*, CJ–98–220, *Petition* at 1. Pieratt's expert testified that the fly ash contaminated his lake such that livestock could not drink the water, sports activities were adversely affected, and excess levels of thallium could negatively impact the fish.

Fly ash is a naturally occurring inorganic material produced in microscopic particles as a residual of burning coal, often in coal-powered generating plants. It is comprised primarily of oxides of silica, iron, aluminum, calcium and magnesium. The marketing of fly ash is prevalent enough to have generated litigation concerning the contracts to buy and sell it. *Mineral Res. Tech. L.L.C. v. Grand River Dam Auth.*, 97 F.Supp.2d 1266 (N.D.Okla.1999).

The Oklahoma Department of Environmental Quality ("DEQ") determined that depositing fly ash on the McQuarys' property did not require a special permit, and explained that fly ash "is a non-hazardous industrial waste which must be disposed of in a landfill permitted to accept such waste." Aplt.App. at 691–692. DEQ conditioned its subsequent approval on the McQuarys' assurance that neither the fly ash, nor surface water with which it came in contact, would discharge from their property.[2] *Id.* at 671–673.

On December 20, 1995, and April 25, 1996, R&M entered into contracts with Dowell to purchase fly ash for $1.60 a cubic yard and to remove the fly ash from the Dowell facility for a specified price. Under the contract dated December 20, 1995, Dowell would pay R&M $18.37 per cubic yard for removal of the fly ash, and under the contract dated April 25, 1996, Dowell would pay R&M $19.60 per cubic yard.

Prior to transporting the fly ash, R&M prepared the ravine by hiring a bulldozer operator to construct an earthen dam, cut down the sides of the fill sites, and remove trees. R&M then hired independent contractors with dump trucks to haul the fly ash from Dowell's facility to the McQuarys' property. The deposited fly ash was then covered with top soil to stabilize it. The McQuarys estimate that between 1994 and 1998, approximately 12,000 cubic yards of fly ash were transported from Dowell's facility and then deposited in their ravine.

The hauling and transportation of the fly ash created revenues of over $200,000 for R&M. Had R&M transported the amount originally anticipated—100,000 cubic yards—R&M would have received over $2,000,000 in revenues. It was specifically for the purpose of covering these fly ash operations that R&M purchased a commercial lines insurance policy from Grain Dealers, effective June 25, 1997 to June 25, 1998.

2. DEQ's requirements for the operation were that:

(1) Neither this material, nor any run-on or run-off surface waters that directly contact this material, shall be allowed to discharge from the McQuary property. Although there are no hazardous constituents of concern based upon the analyses provided, the material may have a potential to negatively impact water quality. Therefore, this material should be covered with soils directly after placement.

(2) The material planned for this use shall be monitored on a consistent basis. Any change in the composition of fly ash purchased, or in the use, handling, or storage of such material by Dowell Schlumberger which has a potential to change the chemical composition of such material shall be reported to the Department. In this event, transport of the material off-site shall cease until further written approval is granted from this Department.

(3) The DEQ retains the right to inspect the property where the material is being deposited at any reasonable time.

Aplt.App. at 671–672.

## II.

In section two of the Farmers policy, entitled "Personal Liability Coverages," the policy clearly states that it does not apply:

   d.  to bodily injury or property damage arising out of business pursuits of any Insured except activities therein which are ordinarily incident to non-business pursuits or farming . . .

Aplt.App. at 532–533. The same section of the Farmers policy contains a pollution exclusion endorsement which also states that the policy does not apply to:

   (1)  bodily injury or property damage which results from the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of *Pollutants* into or upon land, water or air.

*Id.* at 534–535 (emphasis in original). It also defines pollutants as:

   a.  any solid, liquid, gaseous or thermal irritant or contaminant, including acids, alkalis, chemicals, fumes, smoke, soot, vapor and waste. Waste includes materials to be recycled, reclaimed or reconditioned, as well as disposed of.

*Id.* at 582–583.

At this point, the realities of the insurance industry are worth noting. Because business pursuits exclusions have the effect of reducing the amount of potential insurance claims, they also reduce premium rates. *See generally Krings v. Safeco Ins. Co. of America,* 6 Kan.App.2d 391, 628 P.2d 1071, 1074 (1981); *Bartel v. Carey,* 127 Wis.2d 310, 379 N.W.2d 864 (1985). *See also* 35 A.L.R. 5th 375 for a discussion of business pursuits exclusions generally. The district court applied both the business pursuits exclusion and the pollution exclusion to rule in favor of Farmers. Under the view we take, we need discuss only the business pursuits exclusion.

## III.

The controlling issue is thus whether the transportation of the fly ash from Dowell's facility to the McQuarys' property should be treated as a "business pursuit" under section two of the Farmers policy.

### A.

Grain Dealers first challenges the district court's ruling on the ground that, although R&M may have been involved in a business pursuit, the McQuarys were not. Grain Dealers correctly points out that R&M is not an insured under the Farmers policy, and thus its business pursuits are irrelevant to the exclusion's applicability.

Even assuming that the McQuarys are entitled to the protective benefit of the corporate form they chose for R&M, the McQuarys nevertheless were engaged in a business pursuit because their involvement in the fly ash operation flowed from their for-profit employment with R&M. At his deposition, Robert McQuary testified that he personally hauled the fly ash and covered it with dirt at the disposal site, and that this work was pursuant to his employment with R&M. Aplt.App. at 905. An employee's role in a business pursuit is sufficient to bring the employee within the exclusion's scope, given that "business" is defined as "a trade, profession or occupation." *Id.* at 120; see also *Continental Ins. Co. v. Thompson,* 356 F.Supp. 560, 563 (N.D.Okla.1972) (applying the exclusion where damage was caused by work performed by a gas station owners' non-salaried son because he "was engaged in a business pursuit for his parents as their agent servicing automobiles at their service station for a profit"). Further, Robert McQuary testified that he and his wife, as the sole shareholders of R&M, would receive the corporate profits resulting from the fly ash operations. Aplt.App. at

909. Even if the McQuarys were not paid directly for the fly ash disposal, their involvement in the operation was based on "a profit motive," which turns "an activity [into] a business pursuit." *Wiley v. Travelers Ins. Co.*, 534 P.2d 1293, 1295 (1974). Because of the McQuarys' involvement in the fly ash disposal operation, Farmers is not prevented from invoking the business pursuits exclusion.

### B.

Grain Dealers argues also that the business exclusion does not apply because the purposes of the fly ash hauling contract was to improve the condition of the real estate covered by the homeowners-ranchowners policy. They contend that the fly ash was purchased for the purpose of filling the ravine on the McQuary property.

▆ In approaching this question, we do not write on a clean slate. Rather, we must defer to the cumulative experience of the Oklahoma judiciary.

> Parties to insurance contract[s] are at liberty to contract for insurance to cover such risks as they see fit and are bound by terms of contract and courts will not undertake to rewrite terms thereof. The construction of an insurance policy should be a natural and reasonable one, fairly construed to effectuate its purpose, and viewed in light of common sense so as not to bring about an absurd result. *Am. Iron & Mach. Works Co. v. Ins. Co. of North Am.*, 375 P.2d 873 (Okla.1962).

*Wiley*, 534 P.2d at 1295–1296 (Okla.1974).

▆ "[T]he addition of a profit motive to an activity makes it a business pursuit." *Id.* at 1295. Moreover, "[t]he object to be accomplished by the homeowner's policy [is] to insure a home and not a business." *Id.* Finally, "[p]rofit motive, not actual profit, makes a pursuit a business pursuit." *Id.* at 1295.

The *Wiley* case involved a plaintiff who sustained injuries when she was bitten by a dog on the insured's premises. The plaintiff had entered the insured's premises in response to a classified ad in anticipation of purchasing a St. Bernard puppy. The homeowner's policy provided that coverage would not apply "to bodily injury or property damage arising out of business pursuits of an Insured ..." *Wiley*, 534 P.2d at 1294. The court stated: "We would agree the word 'pursuit,' as used in the exclusion, has only its ordinary sense, i.e., to go after, seek, chase, strive for, or engage in an avocation, hobby or the like." *Id.*

The court held that the business exclusion would apply even though the dog operation was only part-time and the insured earned in excess of $10,000 a year from his main occupation as a traveling salesman. Because the language of the policy in *Wiley* tracks precisely that of the Farmers policy, we are bound by the foregoing interpretation of the Oklahoma Supreme Court.

Robert McQuary testified in his deposition that he entered into the fly ash contract with Dowell because "it seemed like a profitable venture." Aplt.App. at 625–626. Farmers argues that because McQuary's motives were profit-oriented, the operation thus qualifies as a business pursuit under Oklahoma case law. *Grain Dealers v. Farmers*, CIV–00–370–T, *Order* at 7 (W.Dist.Okla.2001) (hereinafter *"Order"*). We agree.

The district court reasoned that while "[the McQuarys] received the incidental benefit of reclaiming a ravine ... the task was undertaken as a long-term business enterprise, and not a property improvement project." *Order* at 8 (internal citations omitted). As such, "what Grain [Dealers] refers to as the [McQuarys'] 'maintenance of the fly ash on their prop-

erty' cannot be segregated from the rest of the business operation." *Id.*

We deem that the provisions and expectations of the fly ash contract—together with Robert McQuary's uncontradicted testimony that he entered the fly ash operation with a profit motive—inform and control our analysis. The rule of law announced in *Wiley* in construing the phrase "arising out of business pursuits," the very clause we interpret here, is that "profit motive, not actual profit, makes a pursuit a business pursuit." 534 P.2d at 1295. The rule serves as the major premise of the categorical deductive syllogism that we must follow here.

From here we move to the next premise: whether the profit motive was implicated. Transporting 12,000 cubic yards of fly ash to the McQuarys' premises resulted in gross revenues to R&M of over $200,000. If the operation would have continued as planned, and R&M had transported and disposed 100,000 cubic yards—the amount of material originally anticipated—R&M would likely have grossed approximately $2,000,000. *Order* at 7. Add to this McQuary's statement of his motive for profit. From these premises we must logically conclude that the fly ash operation came within Farmers' business pursuits exclusion.

Grain Dealers nonetheless insists that the damage to Pieratt's property was merely a side-effect of the fly ash operation, and not the result of a core business pursuit. The district court correctly found that the "business" of depositing fly ash did not cease when the fly ash arrived at the McQuarys' property line.

Grain Dealers' contention is also undercut by reviewing the very nature of its policy which R&M purchased. The Grain Dealers' policy was a commercial lines policy that R&M purchased specifically to insure the fly ash operation. That the McQuarys incurred the additional expense of purchasing a commercial lines policy justifies their subjective belief that the fly ash operation itself—a profit-motivated business pursuit—would not be covered by their existing policy. This inference is especially solidified considering the fact that the same insurance agent was retained by the McQuarys for the purchase of both the Farmers and Grain Dealers policies.

\*    \*    \*    \*    \*    \*

In light of the view we take in this case, it is not necessary to meet the other issues presented: whether there was an occurrence during the 1996 policy period which damaged the Pieratt's property, whether the migration of fly ash to the adjacent property was a "personal injury" for purposes of tort law, whether fly ash qualifies as a statutory pollutant, whether the incident was sudden and accidental, and whether the pollution exclusion in the contract entirely eliminates the duty to defend.

We affirm the summary judgment of the district court.