NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: Reporter@vtcourts.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2025 VT 33

No. 24-AP-232

| | |
|---|---|
| In re SM Farms Shop, LLC et al. Permit Appeal (Hartland Planning Commission, Appellant) | Supreme Court |
| | On Appeal from Superior Court, Environmental Division |
| | March Term, 2025 |

Thomas G. Walsh, J.

Peter G. Raymond of Sheehey Furlong & Behm P.C., Burlington, for Appellant.

James P.W. Goss and Shane M. Protivansky of Facey Goss & McPhee, P.C., Rutland, for Appellees.


PRESENT: Reiber, C.J., Eaton, Carroll, Cohen and Waples, JJ.


¶ 1.    **WAPLES, J.**   The Town of Hartland Planning Commission (HPC) appeals the Environmental Division's award of an Act 250 permit to SMFVTMGT, LLC, and SM Farms Shop, LLC, (together, applicants) to construct a farm store on Route 5 near the Interstate 91 interchange in the Town of Hartland. The trial court determined that the project satisfied Act 250 Criteria 9(L) and 10 and granted summary judgment to applicants. We conclude that the project satisfies both criteria and therefore affirm.

¶ 2.    Applicants own a parcel of land on Route 5 in Hartland, Vermont. The parcel is currently a vacant lot of land, approximately a half mile from the center of the Three Corners Village of Hartland. The parcel is approximately 1500 feet—or a twenty-second drive—from the on-and-off ramps to Interstate 91. Near the parcel, Route 5 is a two-lane road with a narrow

shoulder and significant traffic, connecting I-91 to Woodstock, Quechee, Killington and Pico ski areas, and other areas of central Vermont.

¶ 3.     Applicants own and operate Sunnymede Farm, located approximately two miles from the parcel.  Several years ago, applicants began looking for more ways to sell farm goods and made plans to establish a direct-sales store for the Farm on the parcel.  That planning led to the Act 250 application at issue here.

¶ 4.     The proposed project is a 9000 square-foot, two-story farm store with a take-out deli, bakery, eating area, and parking lot.  Applicants have agreed that at least 60% of the goods sold by gross revenue must be produced at or by the Farm.  The remaining products sold will be cheese, condiments, and other Vermont-made agricultural products or other products that complement the Farm's products.  The project will include forty-seven off-street parking spots. The parcel is currently a mix of open and wooded, and the project will create an impervious area of less than an acre without removing any part of the tree line.  The remainder of the parcel will either be left undisturbed or planted with fruit trees and berry bushes, and contain apiaries, the products of which will also be sold at the farm store.

¶ 5.     The parcel has 1450 feet of frontage on Route 5.  The project will develop 446 feet of that frontage, viewable from the road.  No new roads will be constructed for the project, and the project will be served by an on-site well and wastewater disposal system.  There are no shared roadways, driveways, or parking areas on or adjacent to the parcel.  The only means of travel between the parcel and the Village is via Route 5.  There are no sidewalks along that stretch of the road, though applicants have provided a sidewalk easement along the parcel's frontage if the Town decides to extend sidewalks in the future.

¶ 6.    Applicants submitted an Act 250 permit application for the project.  After a site visit and a hearing, the District 3 Environmental Commission of the Natural Resources Board[1] approved the project and issued a permit.  The HPC appealed to the Environmental Division on the grounds that the proposed project did not satisfy either Act 250 Criteria 9(L) or 10.  Applicants cross-appealed, arguing that Criterion 9(L) is void for vagueness.

¶ 7.    Applicants moved for summary judgment.  The HPC opposed applicants' motion and cross-moved for summary judgment.  The Environmental Division found that the project satisfied both criteria and granted summary judgment to applicants without reaching applicants' void-for-vagueness argument.  The HPC appeals.

¶ 8.    Applicants urge us to give deference to the Environmental Division.  We cannot do so.  Though we review mixed questions of law and fact with some deference after a trial on the merits, In re Burton Corp. Conditional Use/Act 250, 2024 VT 40, ¶ 18, __ Vt. __, 325 A.3d 59, this case comes to us not after a trial on the merits but following a grant of summary judgment.

¶ 9.    We review summary-judgment decisions de novo.  In re Mountain Top Inn & Resort, 2020 VT 57, ¶ 18, 212 Vt. 554, 238 A.3d 637.  We will uphold a grant of summary judgment "if there are no genuine issues of material fact and the moving party is entitled to judgment as a matter of law."  In re Diverging Diamond Interchange SW Permit, 2019 VT 57, ¶ 19, 210 Vt. 577, 218 A.3d 564 (quotation omitted).  In ruling on a cross-motion for summary judgment, both parties "are entitled to the benefit of all reasonable doubts and inferences."  Vt. Coll. of Fine Arts v. City of Montpelier, 2017 VT 12, ¶ 7, 204 Vt. 215, 165 A.3d 1065 (quotation omitted).

---

[1]  The Natural Resources Board is now called the Land Use Review Board.  See 2023, No. 181 (Adj. Sess.), § 2.  For clarity and consistency with the record developed in this matter, we refer to it as the Natural Resources Board.

¶ 10.   We review issues of "statutory interpretation without deference to the trial court." In re 204 N. Ave. NOV, 2019 VT 52, ¶ 4, 210 Vt. 572, 218 A.3d 24. "When interpreting a statute, our primary goal is to give effect to the legislative intent and to do so we first look to the plain meaning of the statute." In re Windham Windsor Hous. Trust JO Appeal, 2024 VT 73, ¶ 5, __ Vt. __, 328 A.3d 1225 (quotations omitted). We examine the language of the statute because "we presume that the Legislature intended the plain, ordinary meaning of the statutory language." Mountain Top Inn, 2020 VT 57, ¶ 27. If there is no plain meaning, we will "adopt a construction that implements the . . . legislative purpose and, in any event, will apply common sense." In re Lashins, 174 Vt. 467, 469, 807 A.2d 420, 423 (2002) (mem.) (quotation and citation omitted). "When interpreting a statute, we presume that language is inserted advisedly and that the Legislature did not intend to create surplusage." 204 N. Ave., 2019 VT 52, ¶ 7 (quotation and alteration omitted). Finally, because land use regulations and statutes are in derogation of common law property rights, we construe them narrowly in favor of the property owner. In re Application of Lathrop Ltd. P'ship I, 2015 VT 49, ¶ 29, 199 Vt. 219, 121 A.3d 630.

¶ 11.   As a preliminary matter, we note that both parties largely agree on the facts. We rely only on undisputed facts in our analysis below. The HPC contends that the Environmental Division erred in interpreting the meaning of the relevant Act 250 criteria, codified at 10 V.S.A. § 6086, and in applying the undisputed facts to the statutory criteria. It argues that both Criterion 9(L) and Criterion 10 prohibit the development of the project at issue here. We consider each criterion in turn.

## I.  Criterion 9(L): Settlement Patterns

¶ 12.   The HPC first argues that the project does not comply with Act 250 Criterion 9(L). That criterion provides:

> To promote Vermont's historic settlement pattern of compact
> village and urban centers separated by rural countryside, a permit
> will be granted for a development or subdivision outside an existing

4

settlement when it is demonstrated by the applicant that, in addition to all other applicable criteria, the development or subdivision:

(i) will make efficient use of land, energy, roads, utilities, and other supporting infrastructure; and

(ii)(I) will not contribute to a pattern of strip development along public highways; or

(II) if the development or subdivision will be confined to an area that already constitutes strip development, will incorporate infill as defined in 24 V.S.A. § 2791 and is designed to reasonably minimize the characteristics listed in the definition of strip development under subdivision 6001(36) of this title.

10 V.S.A. § 6086(a)(9)(L). This statute requires a three-part analysis. We must first decide whether the project is "outside an existing settlement." Id. If so, we must then proceed to evaluate whether it (1) makes "efficient use of land, energy, roads, utilities, and other supporting infrastructure," and (2) comports with the strip-development limitations. Id.

¶ 13. A project is within an "existing settlement" if it is either: (i) a designated center, meaning a "downtown development district, village center, new town center, growth center, Vermont neighborhood, or neighborhood development area designated under 24 V.S.A. chapter 76A" or "(ii) an existing center that is compact in form and size; that contains a mixture of uses . . . that are within walking distance of each other; that has significantly higher densities than . . . outside the center; and that is typically served by municipal infrastructure." 10 V.S.A. § 6001(16) (defining "existing settlement"); id. § 6001(30) (defining "designated center").

¶ 14. The project here is outside an "existing settlement." Though a small fraction of the parcel lies within the Village area boundary under the town plan, the project will be developed outside that Village area boundary. The statute requires consideration of where the "development" will occur, not the broader bounds of the parcel on which the development will occur. 10 V.S.A. § 6086(a)(9)(L).

5

## A. Efficient Use

¶ 15.    Because the project is outside an existing settlement, we must evaluate whether it makes "efficient use of land, energy, roads, utilities, and other supporting infrastructure." 10 V.S.A. § 6086(a)(9)(L)(i). The HPC points us to the Natural Resource Board's Act 250 Criterion 9(L) Guidance, to add more context to what is intended by this requirement. However, as explained by applicants, the Guidance was not adopted through notice, hearing, and comment procedures of the Vermont Administrative Procedures Act, and is thus only advisory in this case. See Otter Creek Solar LLC v. Vt. Agency of Nat. Res., 2022 VT 60, ¶ 11, 217 Vt. 374, 295 A.3d 839 (explaining that guidance documents not promulgated using notice-and-comment procedure under VAPA "do not have the force of law"). We accordingly consider the Guidance only as a persuasive, but not binding, authority explaining Criterion 9(L).

¶ 16.    We consider each component of the "efficient use" requirement in turn. The project makes an efficient use of land. The project will develop one acre of the approximately thirteen-acre parcel, with the development clustered next to Route 5. The project will not waste land area because the farm store and parking area will be on the land where it is relatively flat or gently sloping. The remainder of the parcel will either remain undeveloped or will be put to agricultural use in the cultivation of fruit trees and berry bushes. None of the existing tree line will be cut in connection with the development.

¶ 17.    The project makes an efficient use of energy, utilities, and supporting infrastructure. Other than electricity, no new utilities or extension of existing utilities are required for the project. The project will provide its own on-site fire-suppression system. The project will incorporate energy-efficient appliances and utilities, will use high-efficiency LED light fixtures, and will provide charging stations for electric vehicles. The project will also use its own on-site water-supply and waste-disposal system. It will require no infrastructure or municipal expenditures other than routine highway maintenance.

¶ 18. The project also makes efficient use of roads. The project does not require new roads, extensions of roads, or any road upgrades and will have direct access onto Route 5, a paved, maintained highway. There are no other land uses in the immediate vicinity of the project with which the project could share highway access. The parcel is between the Hartland Three Corners Village and the I-91 interchange, where a traffic analysis indicated that the project will have little-to-no impact on "local vehicle congestion and traffic safety." Additionally, the project is only two miles from Sunnymede Farm, which will provide the goods to generate at least sixty percent of the revenue for the store.

¶ 19. Accordingly, we conclude that the project will make "efficient use of land, energy, roads, utilities, and other supporting infrastructure." 10 V.S.A. § 6086(a)(9)(L)(i). The HPC's contention to the contrary is unavailing. The thrust of its argument is that this project, undisputedly located outside a compact village center, cannot make efficient use of land, roads, or utilities because it does not contribute to "Vermont's historic settlement pattern of compact village and urban centers separated by rural countryside." Id. § 6086(a)(9)(L).

¶ 20. The HPC effectively asks us to ignore the components of Criterion 9(L) established by the Legislature. The statute does provide for the goal of promoting "compact village and urban centers separated by rural countryside." Id. However, to that end, it sets out two requirements for permitting a development "outside an existing settlement": (1) that the project "will make efficient use" of the resources necessary for development and (2) that the development comports with the strip development limitations. Id. If we were to agree with the HPC's explanation for why this project is not "efficient," we would effectively bar all development located outside of a village or city center. Such a limiting interpretation of this statutory requirement is not supported by the plain text of Criterion 9(L).

B.  Pattern of Strip Development

¶ 21.    The parcel is not located in an area that "already constitutes strip development," so we must next consider whether the project contributes to a "pattern of strip development along public highways."  10 V.S.A. § 6086(a)(9)(L)(ii).  We assume that the language the Legislature used "is inserted advisedly" and is not intended to create surplusage.  204 N. Ave., 2019 VT 52, ¶ 7.  Thus, the inclusion of the words "pattern of" in the criterion require us to consider not only whether a development meets the statutory definition of strip development, but also whether the development "contribute[s] to a pattern" of such development.  10 V.S.A. § 6086(a)(9)(L)(ii).  We begin by looking to whether the project constitutes strip development.

i.  Strip Development

¶ 22.    The Legislature has defined "strip development" as:

> [L]inear commercial development along a public highway that includes three or more of the following characteristics: broad road frontage, predominance of single-story buildings, limited reliance on shared highway access, lack of connection to any existing settlement except by highway, lack of connection to surrounding land uses except by highway, lack of coordination with surrounding land uses, and limited accessibility for pedestrians.

Id. § 6001(36).  Because the project is "linear commercial development along a public highway," we must consider first whether it falls within the definition of strip development by evaluating each statutory characteristic in turn.  See id.

¶ 23.    First, the project exhibits "broad road frontage."  The project will develop approximately 450 feet of road frontage, out of a parcel containing 1450 feet of frontage.  The store is set close to the road, with parking lots running alongside the highway and large side setbacks.  Though project plans indicate that the side setbacks will be put to wetland or agricultural use, the project nevertheless exhibits broad road frontage.

¶ 24.    Second, the project does not exhibit a "predominance of single-story buildings." The project here will be a two-story building styled to look like a large Vermont barn.

8

¶ 25. Third, the project exhibits "limited reliance on shared highway access." The project will access Route 5 via a single-purpose driveway connecting the store to the highway. The HPC argues that the project's lack of reliance on shared highway access means that this characteristic is present. Applicants urge us to agree with the Environmental Division and find this factor inapplicable where a development is the first and only proposed development in the area. We see no basis to disregard the plain language of the statutory criteria just because the proposed project is the first in some area, so we conclude that this project meets this factor.

¶ 26. Fourth and fifth, the project exhibits a "lack of connection to any existing settlement except by highway" and lacks "connection to surrounding land uses except by highway." The project is located on Route 5, between the I-91 interchange and the Village. The parcel is approximately a half mile from the center of the Village. The only means of travel between the project and the Village is on Route 5. The project includes a sidewalk easement along the frontage of the parcel if the Town ever decides to extend sidewalks along Route 5 in the Village and along the road. The project also includes bike racks. Though the HPC contends that only motor-vehicle travel along Route 5 connects the Village and the project, the town plan designates that stretch of Route 5 as a "local bicycle route." Though a bike route arguably connects the Village and the project, the bike route is itself part of the highway. Thus, we conclude that the project lacks connection to either existing settlements or surrounding land uses except by highway, because of its location on Route 5.

¶ 27. Sixth, the project does not exhibit a "lack of coordination with surrounding land uses." The town plan describes the area as the "site of several small low-intensity businesses of varied types, styles, layout, and placement relative to Route 5" including an "auto-repair facility, a snowmobile sales center, and a small trucking business." There is also a park-and-ride nearby. The project is a farm store designed to look like a barn, and the remainder of the parcel will either be put to agricultural use or remain undeveloped. The HPC argues that the design of the project

9

is immaterial, and that the project does not coordinate with surrounding uses because it is a large retail store that does not plan for future connections with surrounding land uses. We disagree. The project is a commercial space, but at least sixty percent of its revenue must come from products produced by Sunnymede Farms, located only two miles away. We conclude that the proposed farm store coordinates comfortably with surrounding agricultural uses.

¶ 28. Seventh, the project exhibits "limited accessibility for pedestrians." The section of Route 5 along the parcel does not have sidewalks. Though the applicants have provided a sidewalk easement along the frontage of the parcel, there are no present plans to extend the sidewalk. A connection between a parking lot and a store entrance does not suffice to establish pedestrian accessibility within the meaning of Criterion 9(L). Though there appear to be limited sidewalks in Hartland outside of the Village, a municipality's limited pedestrian capacity does not excuse developers from needing to show pedestrian accessibility for new projects.

¶ 29. Because the project meets five of the seven statutory characteristics, it is a "strip development." However, that does not end our inquiry.

ii. "Pattern of" Strip Development

¶ 30. We must also consider whether a project that meets the definition of "strip development" will nevertheless not "contribute to a pattern of strip development along public highways." 10 V.S.A. § 6086(a)(9)(L)(ii)(I). The Legislature provided a statutory definition of "strip development" but did not explain how a project may or may not "contribute to a pattern of strip development." See 10 V.S.A. § 6001.

¶ 31. Accordingly, we are faced with a statutory requirement to consider whether a project will contribute to a "pattern of strip development" without any statutory explanation as to what that entails. Where statutory language is undefined, as here, we accord the language its "plain and ordinary meaning, which may be obtained by resorting to dictionary definitions." Hum. Rts. Def. Ctr. v. Correct Care Sols., LLC, 2021 VT 63, ¶ 16, 215 Vt. 362, 263 A.3d 1260. Black's Law

Dictionary defines a "pattern" as a "mode of behavior or series of acts that are recognizably consistent." Pattern, Black's Law Dictionary (12th ed. 2024). The vernacular usage of "pattern" is very similar. A pattern also means "a reliable sample of traits, acts, tendencies, or other observable characteristics of a person, group, or institution." Pattern, Merriam-Webster Online Dictionary, https://www.merriam-webster.com/dictionary/pattern [https://perma.cc/WM5F-GAP5]. The use of this word evidences a legislative intent for us to consider not only whether the project itself is "strip development," but whether the project is likely to set up a situation where other commercial development will be drawn to the area because of its "recognizably consistent" features of strip development. Thus, a plain and ordinary reading of "contribute to a pattern of strip development" requires us to look to whether the proposed project is likely to entice other development nearby that will exhibit similar traits of strip development. 10 V.S.A. § 6086(a)(9)(L)(ii).

¶ 32. Though the Natural Resource Board's Act 250 Criterion 9(L) Guidance does not bind us, it explains that development which "is not likely to attract other types of commercial development" will not contribute to a pattern of strip development. The Guidance offers several factors or examples that indicate that a project will not contribute to a pattern of strip development, including (1) if the parcels around the project are conserved; (2) if the project is located within an industrial park; (3) if the project is designed to have limited visibility from a public highway, does not use water infrastructure, and will not generate significant traffic; and (4) if the project is a use that contributes to and supports Vermont's working-lands economy. This non-exhaustive list is emblematic of the sorts of factors that may make a project less likely to "contribute to a pattern of strip development." 10 V.S.A. § 6086(a)(9)(L)(ii).

¶ 33. With this explanation of the statute in mind, we must consider whether the project will "contribute to a pattern of strip development." Id. The HPC and the dissent assert that we need to remand for the trial court to determine whether the store will contribute to a pattern of strip

11

development in the first instance. We need not do so. This is a de novo review of a motion for summary judgment, all parties briefed the "pattern of" issue below, and no additional factual development is necessary. See Quinn v. Grimes, 2004 VT 89, ¶ 21, 177 Vt. 181, 861 A.2d 1108 (explaining remand was necessary because of sparse factual record developed with respect to relevant question of law).

¶ 34. The factual record here is extensive and replete with the necessary information for us to evaluate whether the project will "contribute to a pattern of strip development." 10 V.S.A. § 6086(a)(9)(L)(ii). The undisputed record includes aerial imagery of the project and the surrounding area, including descriptions of buildings and businesses nearby; it includes photos and descriptions of Route 5 in the immediate vicinity of the project; and it includes significant, detailed information about the parcel to be developed and the surrounding areas.

¶ 35. Moreover, the project at issue here is a commercial space for applicants to sell goods from their 600-acre farm two miles from the parcel, and at least sixty percent of the farm store's revenue must come from products produced by that farm. The project includes both a farm store and significant agricultural use of the property in the form of fruit trees and berry bushes. The project is agricultural in nature and is unlikely to attract other commercial development to the area. The permit was approved with an unappealed condition that the store may not be converted to a supermarket, hardware store, dry-goods store, pharmacy, or other primary retail store. We thus see little risk of this project contributing to a pattern of strip development in the area.

¶ 36. Though the dissent expresses the desire to see evidence relevant to "whether the lands surrounding the project tract are conserved or if those properties may be commercially developed beyond any existing infrastructure," see post, ¶ 5, the HPC did not point to any missing factual development below. In support of their argument that the project would not contribute to a pattern of strip development, applicants pointed to the "limited developable land surrounding" the parcel and the "agricultural" nature of the project with reference to evidence before the court.

12

In opposition, the HPC responded only that that applicant's argument was "unavailing" and that the project is "not like the types of activity that traditionally fit into the rural landscape." The HPC did not point to any disputes of fact. With a fulsome factual record and without any disputes of fact, we may properly affirm the trial court's grant of summary judgment on alternate grounds. See, e.g., Alpine Haven Prop. Owners Ass'n v. Deptula, 2003 VT 51, ¶ 10, 175 Vt. 559, 830 A.2d 78 (mem.); Towns v. N. Sec. Ins., 2008 VT 98, ¶ 16 n.4, 184 Vt. 322, 964 A.2d 1150; Sabia v. Neville, 165 Vt. 515, 523, 687 A.2d 469, 474 (1996).

¶ 37. The trial court erred in concluding that the project did not meet the statutory definition of strip development. However, because this project makes efficient use of resources and will nevertheless not "contribute to a pattern of strip development," we affirm the trial court's grant of summary judgment to applicants with respect to Criterion 9(L) on alternate grounds. 10 V.S.A. § 6086(a)(9)(L).

II. Criterion 10: Conformity with Local Plans

¶ 38. The HPC also argues that the project does not comply with Act 250 Criterion 10. That criterion provides that the project must be:

> [I]n conformance with any duly adopted local or regional plan or capital program under 24 V.S.A. chapter 117. In making this finding, if the District Commission finds applicable provisions of the town plan to be ambiguous, the District Commission, for interpretive purposes, shall consider bylaws, but only to the extent that they implement and are consistent with those provisions, and need not consider any other evidence.

Id. § 6086(a)(10). The HPC challenges the project as violating this statement in Hartland's town plan:

> Maintaining the Town's natural resource base, agricultural economy, and forest industry are primary objectives of the Town Plan to be implemented through the Rural Area. In these areas, only low density residential development with home occupations will meet these objectives.

13

¶ 39. A court must read the requirements of a town plan "in light of several considerations." In re B & M Realty, LLC, 2016 VT 114, ¶ 32, 203 Vt. 438, 158 A.3d 754. First, a plan provision must be sufficiently "clear and definite to prevent arbitrary application and to provide adequate notice to landowners" to be enforceable. Id. ¶ 33. Because a plan is not a municipal zoning ordinance and need not be as detailed as one, we "will enforce a provision in a . . . plan where it is sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed." Id. ¶ 34 (quotation omitted). Second, a plan must be specific and use mandatory language, mere "broad policy statements phrased as nonregulatory abstractions" are not enforceable. Id. ¶ 35. Third, we must view the plan in its context as a whole, viewing any particular provision "with reference to the broader purposes articulated in the plan, especially where [the provisions] are not internally inconsistent." Id. ¶ 36.

¶ 40. We begin our review by looking to the town plan as a whole. The plan includes a section explaining how the Town is to manage the I-91 interchange. The plan provides that "much of the land surrounding the interchange remains undeveloped pasture that serves as an important scenic resource, providing visual contrast to the highways." It explains that the interchange has a "rural business area character" that sets it apart from the "commercial strip development that exists at many other interchanges." "Commercial development in this area should be compatible with rural surroundings," looking to both the character and nature of the use. Development in the area should be "in keeping with the rural Vermont business image."

¶ 41. The HPC argues that the town plan allows "only low density residential development" in the Rural Area. Because the parcel is located in the plan's defined "Rural Area," a prohibition on any development other than low-density residential development would bar the project. But the plan clearly describes the area in the vicinity of the parcel as a "rural business area" and encourages further business development there, including "traveler services," "farming heritage," "professional offices," or a "hotel." If we were to agree with the HPC that only low-

14

density residential uses are allowed in the rural areas, the town plan would become internally inconsistent in describing the area around the I-91 interchange. Moreover, the town plan encourages the creation of farmlands and a "working landscape" near each village. The project here will bring agriculture to the parcel located just outside the Three Corners Village, while preserving open space and forest.

¶ 42. The provision the HPC points to is so internally inconsistent with the rest of the town plan that it is not "sufficiently clear to give a person of ordinary intelligence a reasonable opportunity to know what is proscribed." B & M Realty, 2016 VT 114, ¶ 34. Accordingly, the Environmental Division appropriately granted summary judgment to applicants with respect to Criterion 10.

Affirmed.

FOR THE COURT:

_____
Associate Justice

¶ 43. **CARROLL, J., dissenting.** I agree that applicants' project meets the definition of strip development because it satisfies five of the seven strip-development characteristics in 10 V.S.A. § 6001(36).[2] However, because the Environmental Division concluded otherwise and did not analyze whether the project will contribute to a pattern of strip development, we should reverse and remand this issue to the Environmental Division to consider the relevant factual record in the first instance as the summary-judgment record does not support affirming on alternate grounds. I therefore respectfully dissent.

_____

[2] I also agree that the project will make "efficient use of land, energy, roads, utilities, and other supporting infrastructure," 10 V.S.A. § 6086(a)(9)(L)(i), and that the project complies with Criterion 10, id. § 6086(a)(10).

¶ 44.    Under Criterion 9(L), we must consider whether the project meets the statutory definition of "strip development," and whether it will "contribute to a pattern of strip development along public highways."  10 V.S.A. § 6086(a)(9)(L)(ii).  If a project meets the statutory definition of strip development—satisfying three of the seven strip-development characteristics in 10 V.S.A. § 6001(36)—it may still be permittable if the project will not contribute to a "pattern of strip development."  To make this determination requires analyzing if the project will likely attract other commercial development in the area.  Ante, ¶ 31.  This analysis focuses on aspects of the project itself and the surrounding areas and property uses.

¶ 45.    Some of this direction comes from the Natural Resources Board[3] Guidance, which lists several aspects of projects that do not contribute to a pattern of strip development, despite having the characteristics of strip development.  These factors include: (1) "[i]f the properties surrounding the project tract are conserved lands that are unable to be developed and the underlying zoning limits commercial development of these properties" e.g., "a winery, country inn, or cross country ski center"; (2) "[i]f the project is located within an industrial park"; (3) "[i]f the project is designed to have limited visibility from a public highway, does not use water or wastewater infrastructure and will not generate significant traffic," e.g., "a self-storage facility"; and (4) "[i]f the project is a use that contributes to and supports Vermont's working lands economy."[4]  Land Use Rev. Bd., Act 250 Criterion 9(L) Guidance 18 (2025) [hereinafter Act 250 Criterion 9(L) Guidance], https://act250.vermont.gov/sites/acttwofifty/files/documents/ Criterion%209%28L%29%20Guidance.pdf [https://perma.cc/NXW5-QSVX] (recognizing that

---

[3]  For consistency with the majority and record in this case, I also refer to the now Land Use Review Board as the Natural Resources Board.  See ante, note 1.

[4]  The Guidance elaborates: "such projects traditionally fit into the rural landscape and traditional part of Vermont' countryside.  Examples include sawmills or other forest project related facilities, stock yards, feed stores, agricultural processing facilities, small engine repair and agricultural or forestry equipment repair or supply."  Act 250 Criterion 9(L) Guidance, at 18.

"context and character of the area, including configuration of the surrounding buildings, roads, parking, undeveloped spaces, and other uses on the land" are considerations for whether project may contribute to "settlement pattern"). The Guidance also states:

> Other circumstances may make a project likely to contribute to a pattern of strip development. Some uses, such as office, restaurants and retail uses are likely to attract additional linear commercial development. Projects containing any of these uses that are <u>designed to include at least three characteristics of strip development</u> are more likely to contribute to a pattern of strip development.

Id. (emphasis added). These considerations are heavily fact dependent.

¶ 46. As noted, the Environmental Division did not reach this issue and therefore did not examine whether the existing summary-judgment record was sufficient or conclusive to determine if the project will contribute to such a pattern here. Although we may affirm a grant of summary judgment on alternate grounds not reached by the trial court, we usually do so only when no weighing of evidence or judgment as to credibility is required. See Alpine Haven Prop. Owners Ass'n v. Deptula, 2003 VT ¶ 10, 175 Vt. 559, 830 A.2d 78 (mem.) (recognizing Court may affirm summary judgment on "alternate grounds" when supported by record); West v. N. Branch Fire Dist. #1, 2021 VT 44, ¶ 51, 215 Vt. 93, 257 A.3d 856 (declining to affirm on alternate ground when "disputed facts remain[ed]"); Sabia v. Neville, 165 Vt. 515, 523, 687 A.2d 469, 474 (1996) ("In ruling on a motion for summary judgment, it is not appropriate for [Supreme Court] to resolve disputed issues of fact or questions of credibility.").

¶ 47. Although the summary-judgment record addresses some of the considerations outlined above, the record does not speak to all these considerations or conclusively establish whether the project is likely to attract other commercial development in the area. For example, the undisputed facts establish that at least sixty percent of the farm store's revenue must come from products produced at or by the farm, the remaining area of the property not occupied by the store will be comprised of fruit trees and berry bushes or will be otherwise undisturbed, and the

17

permit was approved with a condition that the store may "not be converted" into another "primary retail store." However, the summary-judgment record is silent as to whether the lands surrounding the project tract are conserved or if those properties may be commercially developed beyond any existing infrastructure. These facts, for example, are necessary to determine whether the project will contribute to a pattern of strip development or attract additional linear development in the area considering that the project satisfies five of the seven strip-development characteristics. And other factual development may be required to properly make this determination.

¶ 48. Therefore, the proper course is to remand to the Environmental Division to consider the issue in the first instance. That court should, whether through summary judgment or a contested hearing, consider whether the project will contribute to a pattern of strip development. See, e.g., In re Pederzani Admin. Appeal, 2024 VT 82, ¶ 15, __ Vt. __, 328 A.3d 1278 (reversing award of summary judgment and remanding for further proceedings "[b]ecause the Environmental Division did not reach any of the other issues raised by the parties"); Nelson v. Town of Johnsbury Selectboard, 2015 VT 5, ¶¶ 38-39, 198 Vt. 277, 115 A.3d 423 (remanding for trial court to consider in first instance because record was "sparse" as to appropriate standard); cf. Towns v. N. Sec. Ins., 2008 VT 98, ¶ 16 n.4, 184 Vt. 322, 964 A.2d 1150 ("Although the trial court did not reach this issue, . . . the issue was raised below and has been fully briefed on appeal, . . . [and] the issue does not turn on the resolution of any material disputed facts.").

¶ 49. Therefore, I respectfully dissent.

¶ 50. I am authorized to state that Justice Eaton joins this dissent.

_____
Associate Justice